**COVELO INDIAN COMMUNITY, et al., Plaintiffs,**

v.

**James WATT, Secretary of the Interior, et al., Defendants.**

**Civ. A. No. 82–2725.**

United States District Court, District of Columbia.

Nov. 17, 1982.

---

Anita Remerowski, Native American Rights Fund, Kim Jerome Gottschalk, Native American Rights Fund, Boulder, Colo., James C. Moore, II, Alan Bruce Hausman, Moore & Foster, P.C., Washington, D.C., for plaintiff.

Lois J. Schiffer, Sp. Litigation Counsel, Dept. of Justice, James P. Leape, Anne H. Shields, James J. Clear, Attys., Dept. of Justice, Anthony C. Liotta, Deputy Asst. Atty. Gen., Washington, D.C., for defendants.

## I. INTRODUCTION

CORCORAN, District Judge.

Plaintiffs in this action seek declaratory and mandatory injunctive relief to secure rights and duties they claim are owed them, and all others similarly situated, by the defendant federal officials.

As will be more fully set forth herein, the nature of this case required that the proceedings be significantly expedited. Consequently, to accommodate time limits, the parties stipulated to essential facts, and further stipulated to the authenticity of nearly all the documents appended to their briefs. Finally, they agreed to consolidate a trial on the merits with the hearing on the preliminary injunction and other motions. Due to that cooperative effort, several issues are now ready for decision.

Presently before us are the motion of plaintiffs for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure, and the motion of plaintiffs for preliminary mandatory injunctive relief. Defendants have opposed these motions and have themselves moved to dismiss this action, or in the alternative for summary judgment in their favor.

For the reasons set forth below, we grant plaintiffs' motion for class certification,

deny defendants' motion to dismiss or for summary judgment, and grant permanent mandatory injunctive relief in favor of the plaintiff class.

In addressing the merits of this action pursuant to consolidation under Rule 65(a)(2), we have based our factual findings on the stipulated statement of facts, transcripts of certain depositions, the authentic exhibits submitted by the parties, and the November 4, 1982 hearing.

## II. BACKGROUND

Prior to 1966 there was no general statute of limitations applicable to the United States, as plaintiff, seeking money damages on contract and tort claims, although time limitations were imposed upon private individuals. In 1966, Congress sought to correct that apparent inequity and enacted 28 U.S.C. § 2415 which imposes a six-year time period in which the federal government must bring actions based on contracts with the United States, and a three-year limitations period for most tort claims. Subsection g of § 2415 specifically provides that any claims which arose prior to 1966 were deemed to have accrued on the date of enactment of the new statute of limitations, i.e. July 18, 1966.

In late 1971, certain government officials and many Indians became concerned that pre-1966 money damage claims which the United States could pursue as trustee on behalf of Indians whose lands were held in trust or restricted status, might be extinguished with the running of the statute of limitations on July 18, 1972, unless the federal government took action to identify, evaluate, and where appropriate, file lawsuits to assert those Indian claims. The Department of Interior ardently supported an extension of the statute of limitations for pre-1966 Indian claims. 118 Cong.Rec. 28117 (August 14, 1972), *reprinted in* [1972] U.S.Code Cong. & Ad.News 3592, 3595. Consequently, in 1972, Congress extended the time in which the U.S. could assert pre-1966 claims on behalf of Indians to July 18, 1977. P.L. 92–485, 86 Stat. 803 (Oct. 13, 1972).

Once again in 1977, at the urging of the Department of Interior and the Department of Justice, Congress extended the federal statute of limitations insofar as it applied to actions for money damages brought on behalf of Indians with pre-1966 claims. P.L. 95–103, 91 Stat. 842 (August 15, 1977). Interior and Justice Department spokespersons testified that many tribes had only recently become aware of their remedies for pre–1966 claims, and that hundreds of these claims, already identified and being researched, could not be filed by the U.S. in time to meet the statutory deadline. H.R. Rep. No. 95–375, 95th Cong., 1st Sess. 6 (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 1616, 1621. This time, Congress granted an extension until April 1, 1980. P.L. 95–103, *supra.*

The most recent extension of the statute of limitations occurred on March 27, 1980, in P.L. 96–217, 94 Stat. 126, and is the subject of this lawsuit. In its deliberations on this extension, Congress heard testimony from several high-ranking Interior and Justice Department officials. Both executive departments favored another extension. S.Rep. 96–569, 96 Cong., 2d Sess. 5 (1980). Congress reacted by extending the limitations period for pre-1966 Indian damage claims until December 31, 1982.

But in addition, Congress added a critical Section 2 to P.L. 96–217, which provides:

Not later than June 30, 1981, the Secretary of the Interior, after consultation with the Attorney General, shall submit to the Congress legislative proposals to resolve those Indian claims subject to the amendments made by the first section of this Act [extending the limitations period] that the Secretary of the Interior or the Attorney General believes are not appropriate to resolve by litigation.

Plaintiffs' complaint, filed on September 23, 1982, alleges that defendants have violated the mandate of Section 2 in that they have decided not only not to litigate the vast majority of pre-1966 Indian claims subject to the statute of limitations, but they have also declined to submit legislative proposals to Congress to resolve those claims

deemed inappropriate for litigation.[1] Plaintiffs contend that, as a class, all Indians and Indian tribes that have pre-1966 money damage claims affecting lands held in trust or restricted status, have been materially injured by this allegedly unlawful agency action. We agree.

## III. FACTS

The following items constitute the Court's Findings of Fact, based upon the list of stipulated facts, the numerous exhibits, the depositions and the November 4, 1982 hearing. In addition, all other factual conclusions made throughout the text of this decision are incorporated in our findings.

A. *Parties*

1. Plaintiff Covelo Indian Community is a federally recognized sovereign nation of Confederated Tribes, with a governing body duly recognized by the Secretary of the Interior. The Covelo Indian Community has tribal land in the State of California.

2. Plaintiff Dennis Allen is a member of the Skokomish Tribe of Shelton, Washington and is a resident of the Skokomish Reservation.

3. Plaintiff Bertha Visser is a member of the Yakima Tribe of Yakima, Washington and is a resident of the Skokomish Reservation of Shelton, Washington.

4. Plaintiff Sampson Brings Them is a member of the Standing Rock Sioux Tribe and a resident of Fort Yates on the Standing Rock Reservation in North Dakota.

5. Plaintiff Emma Little Chief Randall is a member of the Rosebud Sioux Tribe and a resident of Rosebud, South Dakota on the Rosebud Reservation.

6. Plaintiff Lillian Prue Janis is a member of the Rosebud Sioux Tribe and a resident of Okreek, South Dakota on the Rosebud Reservation.

7. The Shoalwater Bay Indian Tribe is a federally recognized tribe with a governing body duly recognized by the Secretary of the Interior. The Shoalwater Bay Tribe tribal land is in the State of Washington.

8. The Saginaw Chippewa Indian Tribe is a federally recognized tribe in the State of Michigan with a governing body duly recognized by the Secretary of the Interior.

9. The Grand Traverse Band of Ottawa-Chippewa Indians is a federally recognized tribe in the State of Michigan with a governing body duly recognized by the Secretary of the Interior.

10. The Coeur d'Alene Tribe of Indians is a federally recognized tribe in the State of Idaho with a governing body duly recognized by the Secretary of the Interior.

11. The Blackfeet Tribe of Indians is a federally recognized tribe in the State of Montana with a governing body duly recognized by the Secretary of the Interior.

12. Henry Rivers is a member of the Cheyenne River Sioux Tribe and is a resident of Eagle Butte, South Dakota.

13. James Watt is the Secretary of Interior and has overall responsibility for the management of all Indian affairs, and all matters arising out of Indian relations, including the processing of pre-1966 Indian claims.[2]

14. Kenneth Smith is the Assistant Secretary of Interior, Indian Affairs, and has delegated responsibility from the Secretary of Interior for the management of all Indian affairs and all matters arising out of Indian relations, including the processing of pre-1966 Indian claims.

1. Plaintiffs also challenge the entire "2415 Claims Program" as it has been carried out by the Departments of Interior and Justice, in that the evaluation of claims and litigation decision-making has been carried out in an allegedly arbitrary and capricious manner. They also contend that defendants' practices have violated the rulemaking and publication requirements of the Administrative Procedures Act, 5 U.S.C. § 501 et seq. Because we grant relief as to plaintiffs' claim under Section 2 of P.L. 96–217, we do not pass upon these alternative grounds for recovery.

2. The word "claim" or "claims" as used throughout means a matter or matters identified by the Bureau of Indian Affairs ("BIA") as that which could give rise to a cause of action subject to the statute of limitations embodied in 28 U.S.C. § 2415.

15. Roy Sampsel is the Deputy Assistant Secretary of Interior, Indian Affairs (Policy), who has delegated responsibility from the Assistant Secretary of Interior, Indian Affairs, for the management of all matters arising out of Indian relations which includes the processing of pre-1966 Indian claims.

16. John Fritz is the Deputy Assistant Secretary of Interior, Indian Affairs (Operations). He has responsibility for the management of all Indian affairs and of all matters arising out of Indian relations including the processing of Indian claims within the Bureau of Indian Affairs ("BIA").

17. Sid Mills is the Director of the Office of Trust Responsibilities of the Bureau of Indian Affairs under the Commissioner of Indian Affairs, who has direct responsibility for the management of the processing of Indian claims under the BIA's "Statute of Limitations Program."

18. David Stockman is the Director of the Office of Management and Budget, which must approve any legislative proposals made by the Department of Interior for resolution of pre-1966 Indian claims.

19. William Coldiron is the Solicitor of the Department of the Interior, who is charged with supervising the legal work of the Department, including that done for the BIA by the Associate Solicitor for Indian Affairs.

20. Lawrence Jensen is the Associate Solicitor for Indian Affairs in the Department of the Interior whose office does the legal work of the BIA including all that done with regard to the processing of Indian claims.

21. William French Smith is the Attorney General of the United States and is charged with supervising all legal work of the Department of Justice, including work done with regard to the prosecution of Indian claims on behalf of tribes and individuals.

22. Carol Dinkins is the Assistant Attorney General of the United States, Land and Natural Resources Division. Her division is directly responsible for the prosecution of Indian claims referred to her by the Department of the Interior.

### B. Representative Claims

23. Prior to 1966, the County of Mendocino, California, constructed roads, an airport and airport facilities on tribal land of the Covelo Indian Community without the consent of the tribe and without the approval of the Secretary of Interior. One of the roads was later conveyed to the State of California as State Highway 162. The tribe contends it is entitled to trespass damages plus interest. This claim has been characterized as an unapproved right of way claim.

24. Dennis Allen inherited an interest in the Joseph Pulsifer Allotment # 1A on the Skokomish Indian Reservation in the State of Washington. The Joseph Pulsifer allotment was approximately 15.95 acres in size and was sold on July 27, 1955 for $2,000. Dennis Allen's interest in the allotment was determined to be 432/145,800. He alleges that the allotment was, prior to 1966, sold or transferred without his consent and without his receiving any compensation for the sale or transfer. Dennis Allen maintains that he is entitled to the return of his interest in the allotment and trespass damages plus interest. This claim has been characterized as a "secretarial transfer claim."

25. Plaintiff Bertha Visser also has an interest in a secretarial transfer claim. She inherited an interest in the Joseph Pulsifer Allotment # 1A on the Skokomish Indian Reservation in the State of Washington. Her interest was determined to be 1080/145,000. Bertha Visser contends that that allotment was, prior to 1966, sold or transferred without her consent and without her receiving any compensation for the sale or transfer. She claims that she is entitled to the return of her interest in the allotment and trespass damages plus interest.

26. Plaintiff Sampson Brings Them inherited an interest in the allotment of Benedict Brings Them, Allotment # SR 2651,

on the Standing Rock Reservation in the State of North Dakota. That allotment comprised 160 acres and was sold on October 21, 1949 for $1,600. Plaintiff's interest is ⅙. He claims that that allotment was, on October 21, 1949, sold or transferred without his consent and without his receiving any compensation. He contends that he is entitled to the return of his interest in the allotment and trespass damages plus interest. This is also a secretarial transfer claim.

27. Plaintiff Emma Little Chief Randall is the daughter and an heir with a ⅓ interest in the estate of Alice One Butte Little Chief, Allotment # RS–4132. At the death of Alice One Butte Little Chief, and prior to 1966, the BIA paid the sum of $2,757 from her Individual Indian Money Account to reimburse the State of South Dakota for state old age assistance benefits paid to Alice One Butte Little Chief. Emma Little Chief Randall contends that she is entitled to her share of the money paid to the state. This claim has been characterized as an "Old Age Assistance Claim."

28. Plaintiff Lillian Prue Janis is the daughter and heir with ⅒th interest in the estate of Millie Nicholas Prue, Allotment ERS–121–½. At the death of Mrs. Prue, and prior to 1966, the BIA paid the sum of $1,136.83 from her Individual Indian Money Account to reimburse the state of South Dakota for the state old age assistance benefits paid to Millie Nicholas Prue. Lillian Prue Janis contends that she is entitled to her share of the money paid to the State. This claim is also characterized as an old age assistance claim.

29. Plaintiff Shoalwater Bay Indian Tribe has a claim based on the issuance of a fee patent by the United States in 1872 to a non-Indian for lands reserved to the tribe by a Presidential Executive Order.

30. Members of the Blackfeet Tribe of Indians have interests in a number of claims identified by the BIA on the Blackfeet Reservation including approximately 605 claims which can be characterized as forced fee claims, 37 claims which can be characterized as secretarial transfers and dozens of claims which can be characterized as unapproved rights of way easements. The Blackfeet Tribe itself has interests in a number of the claims characterized as unapproved rights of way.

31. Members of the Coeur d'Alene Tribe of Indians and Grand Traverse Band of Ottawa-Chippewa Indians have interests in what are characterized as "Forced Fee Patent Claims."

32. Heirs of deceased members of the Saginaw Chippewa Indian Tribe have what are called "Saginaw Chippewa Dual Allotment Claims." In 1871 Implementing the Treaties of August 12, 1855, and October 18, 1864, the Secretary of Interior began making allotments to the members of the signatory tribes. Two categories of allottees were established: (1) competent; and (2) not so competent. The "competent" Indians were to receive unrestricted fee patents. Errors apparently were made during the allotment process and in an attempt to remedy these mistakes, the Secretary of Interior cancelled 105 such fee patents. Twenty-eight parcels of land on which fee patents were cancelled were reallotted to "not so competent" Indians in restricted fee status. In 1925, the U.S. District Court for the Eastern District of Michigan ruled that the Secretary lacked the authority to cancel fee patents administratively. *U.S. v. Nawcum-o-quay*, Equity No. 60 (E.D.Mich., Oct. 28, 1925). The United States conceded the correctness of this opinion and the BIA dropped the restricted lands from its allotment rolls. As a result, the heirs of twenty-eight Saginaw Chippewas may have claims to vested treaty rights and certain present-day landowners are without clear title.

33. Henry Rivers is the son and heir of William Rivers, Allotment # CR–24. Henry Rivers holds a 2/21 interest in the allotment. In 1979 an unrestricted fee patent on that allotment was issued to William Rivers by the Secretary of Interior without his application. In 1920 William Rivers executed three mortgages on the allotment. That allotment was sold at a county tax sale in 1935. Henry Rivers contends that

he is entitled to the return of his interest in this allotment and trespass damages plus interest. This claim has been characterized as a forced fee claim.

34. The federal government holds title to many Indian lands in trust for the benefit of individual Indians and tribes. It has also placed restrictions on the alienation of other Indian lands.

35. Since at least 1972, officials at the Department of Interior have conducted various efforts to identify, research and prosecute pre-1966 Indian claims subject to the statute of limitations, and they have urged Indians and tribes to come forward with potential claims.

36. Throughout this period, the BIA has instructed its staff and represented to tribes, Indians, and Congress that it would evaluate all claims on an individual basis and that all valid claims would be prosecuted or otherwise resolved within the limitations period.

37. Interior and Justice Department officials have repeatedly represented to Congress that they have a duty to fairly and adequately identify, investigate and resolve all meritorious pre-1966 Indian claims subject to the limitations period in 28 U.S.C. § 2415.

38. The claims process works as follows: A BIA agency official initially researches and documents a claim. The claim then goes from a BIA agency to the BIA Area Office. When the BIA has completed its work on a claim, the claim may be sent to the area field solicitor and may then be referred for litigation to the Office of the Solicitor for the Department of the Interior in Washington, D.C. It then may be referred to the Indian Resources Section of the Department of Justice, Land and Natural Resources Division.

39. Approximately 17,000 pre-1966 Indian claims have been identified by Interior. They include claims for trespass, harmful use of Indian property, breach of contract and wrongful transfer or alienation of Indian property against states, counties, local governments and private individuals. Most of the claims have been rejected by the Departments of Interior and Justice as inappropriate for litigation. The Department of Interior has also rejected legislative resolution of most of these claims as well.

40. The majority of claims identified by the BIA involve the alleged wrongful alienation of individual lands held in trust or restricted status, and the wrongful alienation of other trust interests. They also involve trespasses on Indian trust and restricted land. The identified claims include the Shoalwater Bay Claim and the Saginaw Chippewa Dual Allotment Claims, and other claims as follows:

a. *Old Age Assistance* (OAA): States and local subdivisions were paid by the BIA from the trust accounts of deceased Indians because of state old age assistance rendered to those deceased Indians. At least 1,651 of these claims have been identified.

b. *Forced Fee Patents:* Indian Trust patents were converted to unrestricted fee status by the BIA allegedly without prior application or the effective consent of the allottees. These patents were subsequently lost by the Indians for failure to pay taxes or through subsequent mortgages or sales. At least 2,000 of these claims have been identified.

c. *Secretarial Sales of Allotments in Heirship Status* ("Secretarial transfers"): Sales of inherited allotments on reservations were approved by BIA officials without the consent of all beneficial heirs as allegedly required by 25 U.S.C. § 483.

d. *Unapproved Rights of Way:* Road and utility line rights of way were granted on tribal and allotted lands without effective Indian owner or Secretarial approval. Some unapproved rights of way were accomplished with the assistance of the BIA. Approximately 4,000 of these claims have been identified.

41. A number of claims were identified by the Portland and Muskogee Area Offices of the BIA in which Indians had sold their

allotments prior to 1966 when incorrectly told by state officials that this was a necessary prerequisite to qualify for welfare assistance. In their applications to the federal government for permission to sell their allotments, the Indians recited that they were selling their lands to qualify for welfare. This erroneous belief was not corrected by BIA officials and the allotments were sold. Area Office officials determined that these claims did not present any basis for litigation or resolution by legislation. No attempt was made by the federal government to ascertain whether similar sales took place anywhere else in the country.

42. Numerous rights of way were issued to third parties by the Secretary of Interior pursuant to Section 17 of the Pueblo Lands Act of June 7, 1924, 43 Stat. 636. Interior has declined to bring actions for trespass damages for claims arising from the issuance of these rights of way. As a result of the June 2, 1982 decision in *Pueblo of Santa Ana v. Mountain States Telephone & Telegraph Company,* Civ. No. 8–841–M (D.N.M.), the Solicitor's Office of the Department of the Interior has undertaken to reexamine the merits of these claims.

43. The majority of the claims were identified by the BIA and its contractors, and not individual Indians. Most individual Indians do not have the resources to identify, research and prosecute those claims on their behalf. Some Indian tribes do not have the resources to identify research and prosecute claims on their own behalf.

44. The United States maintains land records, survey maps, contracts and other information relevant to identification, research, and litigation of Indian claims.

45. No comparison of present land values with damage computations was made by the Department of the Interior or Justice officials with regard to the White Earth, Forced Fee Patent and other title claims removed from the Statute of Limitations Program. In the majority of these claims rental value was not computed by the BIA.

46. Among the unapproved rights of way claims, and OAA claims, there may be claims for substantial monetary awards.

47. Interest was not computed by the BIA for the majority of trespass damage claims rejected for litigation.

48. Defendants have not promulgated and published rules and standards for the processing of the claims pursuant to the Administrative Procedure Act, 5 U.S.C. § 553. Defendants have not published general statements of policy pursuant to 5 U.S.C. § 552.

49. Department of Interior internal policies for processing pre-1966 Indian claims have required coordination and consultation on claims with tribes, and notice to claimants, of the disposition of their claims.

50. Since 1980 the Department of the Interior's plan for processing pre-1966 claims has called for the development of a centralized information tracking system to account for all claims identified.

51. Defendants have, at various times prior to the filing of this lawsuit, represented that legislative proposals were being considered to resolve those claims deemed inappropriate for litigation. Moreover, Congress was aware, prior to enactment of 96–217, that certain types of claims, such as the secretarial transfer claims, were considered improper for judicial resolution by Interior and Justice Department officials. *See* H.R.Rep. No. 96–807, 96th Cong., 2d. Sess. 5 (1980), U.S.Code Cong. & Admin. News 1980, p. 206.

52. The majority of claimants were not consulted before the decisions not to litigate their claims nor submit legislative proposals were made. The identity of many claimants is unknown since they are the undetermined heirs of deceased Indians (the "fractionated heirship" problem). The identity of many other claimants is known. Defendants have made some efforts to notify known claimants of the disposition of their claims, but notification has been incomplete.

53. On October 21, 1982, Roy Sampsel, Deputy Assistant Secretary of Interior, submitted a letter to Congress ("Sampsel Re-

port") which defendants contend satisfied their obligations under Section 2 of P.L. 96–217.

54. The current status of certain categories of claims is as follows:

a. *Secretarial Transfers:* These claims were rejected for litigation on August 20, 1979. On August 6, 1981, a decision was made by the Assistant Secretary of Interior, Indian Affairs, not to submit a legislative proposal for the resolution of these claims.

b. *Unapproved Rights of Way:* Pursuant to a June 9, 1981 letter from Assistant Attorney General Carol E. Dinkins, recommending that these claims be resolved by legislation rather than by litigation, Interior officials decided not to litigate these claims. It has also been decided that no legislative proposals will be submitted. Rather, defendants have decided to attempt to validate the "beneficial" rights of way trespasses administratively pursuant to 25 C.F.R. Chapter O. Non-beneficial trespasses, where "significant" damages can be shown, may yet be referred to Justice for possible litigation.

c. *Forced Fee Patents:* Defendants have decided not to seek money damages for these claims, and have taken this category of claims out of consideration under the "2415 Claims Program." No legislative proposals will be submitted by defendants to resolve the claims. Where appropriate, defendants may initiate litigation to quiet title on some of the claims.

d. *Old Age Assistance:* These claims were rejected for litigation. On October 21, 1982, as part of the Sampsel Report, defendants submitted a legislative proposal to Congress to resolve these claims. No additional appropriation was requested by the Department of Interior for fiscal year 1983 for the handling of OAA claims.

e. *Shoalwater Bay Tribe:* A decision has been made by defendants not to litigate this claim. A decision has not yet been made as to whether or not to submit a legislative proposal.

f. *Saginaw Chippewa Dual Allotments:* Defendants have decided not to litigate this category of claims, and not to submit a legislative proposal for its resolution.

g. *Covelo Community:* Defendants have not yet decided whether or not to initiate litigation or submit a legislative proposal to resolve these claims against the State of California and Mendocino County. BIA officials have attempted to negotiate a settlement without formal agency action, but they have not been successful.

55. Other identified claims, such as welfare assistance and mineral rights claims, were not mentioned in the Sampsel Report, and their status is unclear at this time.

56. The proposed administrative validation of "beneficial" rights of way trespass claims under 25 C.F.R. Chapter O, will not be completed by December 31, 1982.

57. Interior officials have not yet submitted all of the claims to be considered for litigation to the Department of Justice.

58. Defendants oppose any further extensions of the statute of limitations, and firmly believe that the 2415 Claims Program will be adequately completed by December 31, 1982. This view is not shared by members of Congress who have submitted legislation to extend the statute of limitations, as well as impose more stringent reporting requirements upon defendants with respect to their identification, evaluation and overall handling of Indian claims subject to 28 U.S.C. § 2415. *See* Cong.Rec. S12669–70 (daily ed., Sept. 29, 1982) (remarks of Sen. Cohen introducing S. 2978 entitled the "Indian Claims Act of 1982"); H.J. Res. 553 (introduced by Rep. Udall, July 28, 1982); Oversight Hearing on Statute of Limitations Before Senate Select Committee on Indian Affairs, 97th Cong., 2d Sess., 20–21 (testimony of Lawrence Jensen, Sept. 16, 1982).

## IV. DISCUSSION

### A. *Class Certification*

Plaintiffs have moved for an order pursuant to Rule 23(c)(1) of the Federal Rules of Civil Procedure certifying this case as a class action. The purported class would include Indians and tribes with pre-1966 claims identified by the BIA or its contractors, or that reasonably could have been identified under the 2415 Claims Program, which claims defendants have decided not to litigate or otherwise resolve, as required by P.L. 96–217, before the running of the statute of limitations.[3] Plaintiffs contend that a class action is properly maintainable under Rules 23(a) and 23(b)(2).

Defendants object to class certification on four specific grounds: (1) the class as defined is vague and its members are not ascertainable; (2) the representatives of the class have no standing; (3) certification would unfairly bind all potential claimants if plaintiffs lose the case; and (4) defendants have not acted or refused to act on grounds generally applicable to the class.

While we feel that plaintiffs' definition needs slight refinement, we conclude that they have met the necessary prerequisites to the maintenance of a class action.

██ Defendants initially contend that the purported class is indeterminate because, in order to ascertain whether or not a pre-1966 Indian claim has been "validly resolved" consistent with P.L. 96–217, the Court will have to look at the facts and circumstances surrounding the disposition of each and every claim.[4] When case-by-case determinations of fact must be made, defendants argue, class certification is not appropriate. *See Gordon v. Aetna Life Insurance Company,* 151 D.C.App. 391, 467

F.2d 717, 720 (1971). Plaintiffs contend, however, that defendants' conduct need only be examined as it applies generally to the class of Indian claimants sought to be represented. We agree with plaintiffs.

The very narrow question before us is whether defendants have complied with Section 2 of P.L. 96–217 as to those claims deemed inappropriate by defendants for litigation. The relevant class, therefore, consists of those Indians and tribes whose 2415 claims have been rejected for litigation and for which no legislative proposals have been submitted to Congress. The members of that class can easily be ascertained from BIA records in conjunction with the Sampsel Report. We need not review the merits of each claim; we need only look for the salient characteristic i.e. no litigation coupled with no legislative proposal. Here, as in *Rochford, supra,* the contours of the class are defined by defendants' own conduct, and the class is definite.[5]

Turning to the explicit requirements of Rule 23(a), plaintiffs must satisfy all four: *viz,* numerosity, commonality of questions of law or fact, typicality of claims or defenses, and adequacy of representation. *E.E.O.C. v. Printing Industry, Etc.,* 92 F.R.D. 51, 53 (D.D.C.1981).

### 1. *Numerosity*

There can be no question that the first requirement, numerosity, is met. Defendants have rejected the vast majority of some 17,000 identified claims for litigation and legislative resolution. Thus, it would be impracticable to join thousands of claimants from across the country in one lawsuit.

### 2. *Common Question*

Defendants contend that there are no common questions of law or fact applicable

---

3. This definition was supplied at the November 4, 1982 hearing in an effort to clarify plaintiffs' initial description of the class.

4. We note that *definiteness* is not explicitly required under Rule 23. *Alliance to End Repression v. Rochford,* 565 F.2d 975 (7th Cir. 1977). It has, however, been implied by many courts as a common sense adjunct to the other elements of Rule 23(a). *Id.* We concur with and follow that approach.

5. Since legislation has been proposed, although untimely, for Old Age Assistance claims, that category of claimants must, of course, be excised from the class, in conjunction with all those for whom litigation has been, or will be initiated by defendants, before December 31, 1982. Once again, defendants' records can be used to identify these claimants.

to the purported class. They maintain that each claim is unique and their conduct as to it must be judged accordingly. As pointed out above, however, there is a common legal issue—the meaning of Section 2 of P.L. 96–217. The relevant factual inquiry, generally applicable, is whether a particular claim has been disposed of in accordance with the proper construction of that statute. Thus, plaintiffs have met the second requirement of Rule 23(a).

### 3. *Typicality*

For similar reasons, we conclude that plaintiffs have also met the typicality requirement. This Court (Richey, J.) succinctly stated in *Printing Industry:*

> [a] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory. 1 Newberg, *Class Actions* § 1115f at 191 (1977).

*Id.* at 54. Here, the course of conduct complained of is defendants' failure to submit legislative proposals for those pre-1966 Indian claims they have deemed improper for litigation. There is no dispute that, with the exception of the representatives with OAA claims, the named plaintiffs have claims for which no legislative proposals have been submitted, and no litigation has been initiated. We are convinced that these claims are typical of the class.

### 4. *Adequacy of Representation*

This depends on (a) whether plaintiffs' counsel is experienced and qualified, and (b) whether plaintiffs' interests are coextensive with those of the class. *Simpson v. Miller,*

93 F.R.D. 540 (N.D.Ill.1982). Defendants contend that the named class representatives are inadequate, in that they individually lack standing since their claims have been "validly resolved."[6]

This argument begs the ultimate question except as to the representatives who have OAA claims. Those representatives have arguably secured the relief sought here under P.L. 96–217, in that a legislative proposal to resolve their claims has been submitted. As to them, accordingly, this particular case is moot and they have no standing. However, almost all of the other named plaintiffs have claims subject to the statute of limitations in 28 U.S.C. § 2415 which have neither been slated for litigation nor legislative treatment. Consequently, those Indians and tribes have interests which are coextensive with the interests of the entire class, and hence are adequate representatives.[7]

In addition to the factors discussed above, Rule 23(b)(2) requires plaintiffs to show that defendants have acted or failed to act on grounds generally applicable to the class. Defendants' refusal to submit legislative proposals for those 2415 claims they deem inappropriate for litigation is a refusal to act generally applicable to the class, and if improper, it justifies mandatory injunctive relief with respect to the class as a whole.[8]

For all the foregoing reasons, we conclude that plaintiffs have shown sufficient justification for certifying this matter as a class action. Accordingly, this case will be certified as a class action on behalf of all Indians and tribes with pre-1966 claims subject to 28 U.S.C. § 2415 that have been

---

**6.** Defendants do not challenge the adequacy of plaintiffs' legal representation, and neither do we.

**7.** The following named plaintiffs, at a minimum, are adequate class representatives in that they have claims which fall into the relevant category: Covelo Indian Community, Dennis Allen, Bertha Visser, Sampson Brings Them, Shoalwater Bay Indian Tribe, Blackfeet Tribe, and Henry Rivers. Since these Indians and tribes each have their own claims, and they are sufficient to represent the class in question,

we need not decide whether, as plaintiffs argue, tribes as sovereigns may sue the federal government as *parens patriae* on behalf of their members.

**8.** Defendants' contention that certification would unfairly bind all potential claimants if plaintiffs lose has no merit. Since plaintiffs have met the requirements of class certification under Rules 23(a) and 23(b)(2), due process has been satisfied as to absent class members.

identified by the BIA, the federal defendants, or any of their contractors, and that have not been or will not be litigated prior to December 31, 1982, and that have not been the subject of legislative proposals submitted to Congress.

## B. *Justiciability and Jurisdiction*

### 1. *Justiciability*

■ The federal defendants assert that plaintiffs are asking this Court to review discretionary decisions of Executive agencies in contravention of the well-settled principle that such decisions are non-reviewable because a political question is presented. *See Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Laird v. Tatum,* 408 U.S. 1, 15, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972) (federal courts should not be "continuing monitors of the wisdom and soundness of Executive action . . ."). Plaintiffs counter that P.L. 96–217 is unambiguous on its face i.e. Section 2 mandates that the Secretary of the Interior propose legislative solutions for those claims that are deemed not suitable for litigation and that, accordingly, we need only decide whether defendants have complied with the Congressional mandate, signed into law by the Executive.

Whether the resolution of a matter violates separation of powers principles, thereby making it a non-justiciable political question, must be determined under the oft-cited criteria outlined in *Baker v. Carr, supra:*

[a] textually demonstrable constitutional commitment of the issue to a coordinate political department, or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolu-

tion without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, 82 S.Ct. at 710; *see also, Consumer Energy, Etc. v. F.E.R.C.,* 673 F.2d 425, 452 (D.C.Cir.1982).

Defendants claim that: (a) the decisions plaintiffs challenge are committed by the Constitution to Congress and the Executive; (b) there are no judicially manageable standards for resolving the questions presented; and (c) deciding the questions plaintiffs raise would involve policy determinations of a kind most appropriate for the non-judicial branches of government. We find none of these arguments persuasive.

■ As we have previously stated, our review is based exclusively on P.L. 96–217 and the requirements imposed by Section 2 thereof. Defendants contend that they have fully complied with Section 2, but plaintiffs challenge the federal defendants' construction of that statute. Thus, we are confronted with a classic judicial problem of statutory construction. The narrow question presented is whether Congress and the President meant to limit defendants' exercise of discretion to certain alternatives.[9] This issue has clearly not been committed by the Constitution to coordinate branches of government.

Similarly, we are not lacking in discoverable, manageable standards. As in any case involving statutory construction, we have the plain language of the statute and its legislative history to guide our interpretation of its requirements. Defendants' second argument, therefore, fails to raise a *Baker* factor.

---

**9.** Defendants' contention that the Executive branch's discretion as to whether or not to propose legislation can never be constitutionally limited in light of Article II, Section 3, is simply erroneous. By signing P.L. 96–217, the President authorized and approved the require-

ments of Section 2. If the Executive's discretion was thereby restricted, it was done by his own hand and is, therefore, beyond a charge of constitutional infirmity. *See Nixon v. Administrator of General Services,* 433 U.S. 425, 441, 97 S.Ct. 2777, 2789, 53 L.Ed.2d 867 (1977).

Lastly, we are not called upon, as defendants contend, to judge the wisdom and soundness of policy determinations most appropriately made by the non-judicial branches of government. Rather, we need only determine what those policy considerations were, as embodied in P.L. 96–217. In doing so, we certainly do not express a lack of respect for the coordinate branches, for "[I]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch.) 137, 178, 2 L.Ed. 60 (1802).[10]

In sum, we conclude that this case only involves traditional statutory construction, a classic judicial function, and, therefore, no political question is present.

### 2. *Jurisdiction*

Plaintiffs rely on 28 U.S.C. §§ 1331 (federal question), 1361 (mandamus) and 1362 (Indian tribes), as their grounds for establishing subject matter jurisdiction in this Court. The cause of action, they contend, arises under P.L. 96–217, the APA and the due process clause of the 5th Amendment. Defendants do not address the jurisdictional bases directly, but, rather, contend that plaintiffs do not have standing within the parameters of Article III to assert their cause of action.

Because we find jurisdiction in the statutory claims, we need not address the constitutional issues. We will, however, treat the questions of jurisdiction and standing separately in our discussion.

■ To determine whether plaintiffs have stated a claim that arises under Section 2 of P.L. 96–217 and thereby confers jurisdiction through §§ 1331 and 1362 as well as a claim that properly seeks injunctive relief in the nature of mandamus, whose jurisdictional root is § 1361, we must look to the complaint and the language of P.L. 96–217. The test to be applied was

well stated in *Carpet, Linoleum and Resilient Tile, Etc. v. Brown,* 656 F.2d 564, 567 (10th Cir.1981):

If dereliction in discharging a mandatory duty is alleged and if that allegation is not patently frivolous, both mandamus and injunctive relief are available ... If, however, defendants have been accorded sufficient discretion to act as they have, the courts may not direct them to act otherwise, and dismissal for lack of jurisdiction is appropriate.

Applying this standard, we conclude that plaintiffs' jurisdictional base is solid.

■ Section 2 of P.L. 96–217 states in unequivocal terms that the "Secretary of the Interior, after consultation with the Attorney General, *shall submit* to the Congress legislative proposals to resolve *those Indian claims ....* not appropriate to resolve by litigation." (emphasis added). Plaintiffs specifically allege that defendants have not complied with this mandate. That allegation cannot be labelled "patently frivolous" in light of the admitted fact that defendants have refused to submit legislative proposals for the majority of 2415 claims deemed inappropriate for litigation, even though Section 2 does not, on its face, vest defendants with discretion to choose that course of inaction. We conclude, therefore, that plaintiffs have established federal jurisdiction.

It is a separate question, however, whether plaintiffs have standing to challenge defendants' conduct. We now turn our attention to that issue.

### C. *Standing*

Defendants strenuously argue that plaintiffs have not met the Article III requirements for standing because: (1) plaintiffs have not suffered the requisite injury in fact, and (2) there is no substantial likelihood that the relief requested will redress

---

**10.** Defendants chiefly rely on *National Wildlife Federation v. U.S.,* 200 U.S.App.D.C. 53, 626 F.2d 917 (1980), for their political question argument. That case, however, is inapposite for two compelling reasons. First, the Executive report to Congress in that case was challenged

on the sufficiency of the President's analysis with respect to the federal budget, an entirely different matter than the one presented *sub judice.* More importantly, however, the Court of Appeals explicitly declined to reach the political question issue. *Id.* at 925, n. 14.

any of plaintiffs' claimed injuries. *See National Treasury Employees's Union v. Campbell,* 210 U.S.App.D.C. 69, 654 F.2d 784, 789 (1981); *Greater Tampa Chamber of Commerce v. Goldschmidt,* 200 D.C.App. 205, 627 F.2d 258 (1980). Plaintiffs counter that they have standing under Section 10 of the APA, 5 U.S.C. § 702,[11] to challenge defendants' conduct with respect to Section 2 of P.L. 96–217 because plaintiffs are within the zone of interests sought to be protected by that statute, and they have been concretely injured by defendants' failure to comply with Section 2's requirements.

■ Article III imposes three criteria a plaintiff must meet in order to establish standing:

> That is, there must be injury in fact, a connection between the injury claimed and the plaintiff. Second, the injury must be fairly traceable to the defendant's action, a connection between the injury and defendant's actions. And third, there must be a likelihood that the injury will be redressed by a favorable decision, a connection between the injury and the action requested of the court.

*Consumers Union of U.S., Inc. v. Federal Trade Commission,* 691 F.2d 575, 577, n. 9, No. 82–1737, slip op. at 5, n. 9 (D.C.Cir. Oct. 22, 1982) (citing *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). To these must be added the requirement of § 702, that the interest sought to be protected be arguably within the zone of interests to be protected by the relevant statute. *Valley Forge, supra; Data Processing Service v. Camp,* 397 U.S. 150, 152–53, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); *see also State of California v. Watt,* 683 F.2d 1253 (9th Cir. 1982).

Plaintiffs assert that they have suffered injury due to defendants' failure to submit legislative proposals to Congress pursuant to Section 2 of P.L. 96–217, and they are threatened with further injury if defend-ants fail to submit such proposals as to all claims not litigated before the statute of limitations runs on December 31, 1982. Defendants argue, however, that injury in fact here can only be measured in terms of money damages. They contend that, even if we granted the relief requested, there is no substantial likelihood that plaintiffs would receive money; therefore, there is no causal link between the relief sought and the actual injury suffered by plaintiffs. Defendants misapprehend the focus of this lawsuit.

The crux of plaintiffs' case is that Section 2 of P.L. 96–217 requires defendants to propose legislation for *all* pre-1966 Indian damage claims not going to be litigated by them. Defendants have declined to submit timely legislative proposals for some, and they have categorically refused to submit proposals for the vast majority of claims which will not be litigated. As a result, plaintiffs' claims are likely to expire on December 31, 1982 without either judicial or legislative resolution.

■ Plaintiffs have a concrete interest, therefore, in seeing to it that Congress has at its disposal all the tools it directed defendants to provide in order that 2415 claims be equitably and justly resolved. *See* H.R.Rep. 96–807, *supra* at 5; 128 Cong. Rec., *supra* at 12670. We conclude that plaintiffs have shown a strong link between themselves and the injury claimed. They have also established a sufficient connection between the injury claimed and defendants' actions and inactions. Moreover, the relief they request, an order directing defendants to submit the required legislative proposals, would explicitly redress the injury being examined in this case.

For similar reasons, it can easily be seen that plaintiffs' interests fall within the zone of interests sought to be protected by P.L. 96–217. In fact, their interests were a primary concern of the lawmakers who passed the statute. Senator Cohen's recent re-

---

11. 5 U.S.C. § 702 provides:

A person suffering legal wrong because of agency action, or adversely affected or ag-grieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

marks describing the need for a further extension of § 2415 are revealing in this regard:

> I would like to say that in granting these various extensions to the statute, there have been three overriding concerns of the Congress. First, is to assure substantial justice to the Indians in the prosecution of their claims.

128 Cong.Rec., *supra* at 12670. The three Committee reports which attended the passage of P.L. 96–217 are replete with declarations of the federal government's responsibility to fairly and adequately resolve all pre-1966 Indian claims. *See* H.R.Rep. 96–807, *supra;* S.Rep. 96–569, *supra;* H.R.Rep. No. 96–843 (Conf.Rep.), 96th Cong., 2d Sess. (1980).

In sum, plaintiffs have met the standing requirements of Article III and the APA. We now proceed to a discussion of the merits of the case.[12]

### D.  *Merits of the Case*

■ In this lawsuit we are called upon to examine federal agency conduct as it relates to the requirements of P.L. 96–217. Since that statute does not contain its own standard of review, we must look to the APA, 5 U.S.C. § 706, for the appropriate standard. *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678 (D.C.Cir.1982).

Plaintiffs' chief allegation is that defendants have failed to fulfill the mandate of Section 2 of P.L. 96–217 by refusing to submit legislative proposals for *all* claims rejected for litigation. Judicial review of a claim of agency inaction is governed by § 706(1), which provides that a reviewing court shall, "compel agency action unlawfully withheld or unreasonably delayed."

*See Environmental Defense Fund v. Costle,* 211 U.S.App.D.C. 313, 657 F.2d 275 (1981). This standard can be measured by either of two questions:

> (1) whether the agency has violated its statutory mandate by failing to act . . . or (2) whether the agency's delay in acting has been unreasonable. (citations omitted).

*Id.* at 283–84.

■ Mandatory injunctive relief under § 706(1) or 28 U.S.C. § 1361 is appropriate, "if the court's study of the statute and relevant legislative materials cause[s] it to conclude that the defendant official ha[s] failed to discharge a duty that Congress intended him to perform. . . ." *Carpet, Linoleum & Resilient Tile, Etc., supra* at 566 (citations omitted); *see 13th Regional Corp. v. U.S. Department of Interior,* 210 U.S. App.D.C. 43, 654 F.2d 758, 760 (1980) ("As long as the statute, once interpreted, creates a peremptory obligation for the officer to act, a mandamus action will lie."); *Davis Associates, Inc. v. Secretary, Department of Housing and Urban Development,* 498 F.2d 385, 389 and n. 5 (1st Cir.1974). Mandamus is nevertheless, a power to be exercised within the trial court's sound discretion, and may be refused even though jurisdiction is established. *National Wildlife Federation, supra.*

The fundamental question presented by this lawsuit is whether Section 2 of P.L. 96–217 requires the Secretary of the Interior to submit to Congress legislative proposals to resolve *all* pre-1966 Indian claims subject to 28 U.S.C. § 2415, that have been rejected for litigation. To resolve this issue, we must examine the language of the statute, in light of its legislative history.[13]

---

**12.** Defendants contend, as a final argument for dismissal, that plaintiffs' action is barred by laches. They claim that plaintiffs had enough knowledge concerning the decisions not to litigate and not to propose legislation, to institute a lawsuit much earlier in time. This argument lacks merit since defendants did not make public many of their final decisions until the Congressional Oversight hearings held September 16 and 23, 1982. Moreover, the Sampsel Report, which defendants contend satisfies their

obligations under Section 2 of P.L. 96–217, was not submitted until October 21, 1982, making this case truly ripe at that time. If anyone has been guilty of foot-dragging in pursuing this matter, it has been defendants. Their equitable defense must, therefore, fail.

**13.** Section 2 of P.L. 96–217 provides in full: Not later than June 30, 1981, the Secretary of the Interior, after consultation with the Attorney General, shall submit to the Congress legislative proposals to resolve those Indian

Section 2 was added to S. 2222, the original bill, by the House Judiciary Committee. The provision, in its initial form, required the Attorney General to make the stated legislative submissions by December 31, 1980. That duty was later transferred to the Secretary of the Interior, and, at the request of the Attorney General, the deadline for submission was extended to June 30, 1981 in the course of the floor debate just prior to the bill's passage in the House of Representatives. *See* 126 Cong.Rec. 1948–49, 96th Cong., 2d Sess. (daily ed. March 24, 1980) (remarks of Rep. Danielson, the floor manager).

The import of Section 2 was clearly expressed in the House Report accompanying the amended bill to the floor:

> From the congressional testimony of the witnesses representing the Department of Justice and the Department of the Interior, it appears that some of the Indian claims and potential Indian claims may be ones that are not appropriate to resolve through litigation. The purpose of the Attorney General's report is to identify alternative legislative proposals that Congress may want to consider to resolve these claims in a manner that is fair to all the parties concerned. It is also hoped that such a report will aid the Committee in discharging its oversight responsibility regarding this subject matter.

H.R.Rep. 96–807, *supra* at 5, U.S.Code Cong. & Admin.News 1980, p. 210.

■ Congress was acutely aware that litigation in many instances would be unfair to third parties who had purchased or inherited their property many years ago without knowledge of the Indian claims. The legislators were also troubled by the serious problem of complicity on the part of the federal government in bringing about many improper transfers and encumbrances of Indian land (e.g., Secretarial transfer, Forced Fee and OAA claims). S.Rep. 96–569, *supra* at 3; Oversight Hearings on Statute of

Limitations Before the Senate Select Committee on Indian Affairs, 96th Cong., 1st Sess. 3–13 (1979) (Statement of Forest Gerard, Assistant Secretary for Indian Affairs). Litigation was thought inappropriate in these cases because the government would have to sue itself on behalf of the Indian claimants. *Id.*

Congress reacted to these concerns by adding Section 2 so that innocent Indian claimants would be given thorough consideration, even though judicial resolution of their claims might be ruled out. Referring specifically to the amendment adding Section 2, the Congressional Conferees stated:

> The language of the House amendment requires a report to be submitted to the Congress by the Secretary of the Interior, after consultation with the Attorney General, by June 30, 1981, which details legislative proposals to resolve those Indian claims that they feel are not appropriate to resolve by litigation. The Conference Report adopts the language of the House amendment. This language was agreed to by the Conferees to ensure that these claims are expeditiously and equitably resolved.

H.R.Rep. 96–843 (Conf.Rep.), *supra* at 4, U.S.Code Cong. & Admin.News 1980, p. 216.

In light of the above, we conclude that Section 2 of P.L. 96–217 imposes a duty upon defendants to propose legislative solutions for all those claims they decide not to litigate. Prior to its passage of P.L. 96–217, Congress was apprised by defendants of the reasons they now cite in the Sampsel Report, which they believe support their decisions not to litigate various categories of claims. It is clear from the legislative history that Congress wanted assistance from defendants in the form of carefully considered legislative proposals designed to resolve "those claims" deemed inappropriate for litigation, in order to bring about a swift, yet equitable, conclusion to the 2415 Claims Program. It is also clear from the stipulated facts, however, that defendants have not complied with Section 2.

---

claims subject to the amendments made by the first section of this Act that the Secretary of the Interior or the Attorney General be-

lieves are not appropriate to resolve by litigation.

Defendants argue that the Sampsel Report, submitted October 21, 1982, some 15 months late, satisfies their obligations under Section 2. That report, however, contains only one legislative proposal which relates to approximately 50% of the total number of one class of claims, *viz.*, the OAA claims. If defendants are permitted to pursue their plan, as set out in the Sampsel Report, the remainder of nonlitigated claims will essentially be willed out of existence by defendants. In this court's opinion, this is not what Congress intended.

A telling reaction to defendants' construction of Section 2 came from Senator Cohen in his remarks introducing legislation to extend the statute of limitations yet another time: [14]

> I do not agree with the conclusion of the Department of the Interior in its communication to this committee on June 25, that legislation to address the old-age assistance category of claims will bring the Government into substantial compliance with the requirements of P.L. 96–217 that the Department of the Interior in consultation with the Department of Justice submit to the Congress legislative proposals to resolve these outstanding Indian claims.
>
> A decision to waive a claim for damages on the grounds that the claim for title to land is not barred does not do justice to either the Indian claimant or the non-Indian who is occupying the land in good faith and under color of title.
>
> A decision to administratively resolve rights-of-way claims in a manner that waives a claim for past damages without notification to the Indian whose claim is affected does not reflect the good faith owed by the trustee. Also, a waiver of past damages on water rights claims and claims for degradation of the environment resulting in destruction of fish stocks will almost certainly adversely affect the bargaining position of the United States and the tribes in attempting to reach settlement of these claims.

. . . . .

> I feel that the dispositions that have been made by the Department of the Interior and the Department of Justice of these claims falls far short of the intent of Congress in enacting Public Law 96–217.

128 Cong.Rec. *supra* at 12670. As Chairman of the Senate Select Committee on Indian Affairs, and a previous opponent of P.L. 96–217, Senator Cohen is particularly well-informed about the entire claims program. It stands to reason, therefore, that his opinion on defendants' handling of the program is entitled to significant consideration.

Defendants' wholesale disposition of thousands of claims through the Sampsel Report, after more than 10 years and countless dollars have been spent identifying and evaluating pre-1966 Indian claims, does not comport with the statute. The statute imposed a mandatory duty owing to plaintiffs and to Congress. We hold that defendants have breached that duty.

## V. CONCLUSION AND ORDER

Our review of the plain language of Section 2 of P.L. 96–217, the relevant legislative history and the factual record herein, convinces us that defendants have both unlawfully failed to carry out a duty imposed on them by Congress and the President, as well as unreasonably delayed submitting the only legislative proposal contained in the Sampsel Report. Due to this conduct, plaintiffs' chances of getting favorable resolutions of their claims have been seriously prejudiced.

For the foregoing reasons, we conclude that mandatory injunctive relief is appropriate in this case.

Accordingly, it is, this 17th day of November, 1982,

---

14. Although Senator Cohen's remarks were made before the formal submission of the Sampsel Report to Congress, he had been informed through letters and testimony before his Committee on September 16, 1982, of the decisions outlined in that report.

ORDERED that this case be, and hereby is, certified as a class action on behalf of all Indians and tribes with pre-1966 claims subject to 28 U.S.C. § 2415 that have been identified by the BIA, the federal defendants, or any of their contractors, and that have not been or will not be litigated prior to December 31, 1982, and that have not been the subject of legislative proposals submitted to Congress; and it is

FURTHER ORDERED that defendants' motion to dismiss be, and the same hereby is, DENIED, and it is

FURTHER ORDERED that defendants shall submit legislative proposals to Congress designed to resolve all those claims held by the plaintiff-class, that defendants will not litigate before December 31, 1982, and it is

FURTHER ORDERED that said legislative submissions be made in due course, but in any event, not later than December 15, 1982, and it is

FURTHER ORDERED that if defendants cannot make the necessary legislative submissions by that date, they shall institute protective litigation to cover those claims not the subject of legislative submissions,[15] and it is

FURTHER ORDERED that, to the extent not already accomplished as evidenced in the record herein, defendants shall notify members of the plaintiff-class, individual or tribal where appropriate, as to the current status of their claims and the nature of the forthcoming statutory deadline of December 31, 1982 for the institution of litigation.

15. In the course of the hearing it was brought out that plaintiffs intend to press the upcoming, lame-duck Congress for an extension of the statute of limitations. Defendants, on the other hand, stated that they will not join in that effort—that the letter of October 21, 1982 expresses their final position.

We fully expect that an expedited appeal will be taken by federal defendants from our ruling today. We would not presume to predict the outcome, but in light of the fact that December 31 is the present cut-off date, we do foresee difficulties if litigation is carried forward for any substantial period, and if our ruling is ultimately affirmed.

We cannot, of course, order a change in attitude but, considering the pressures of time, we do not deem it inappropriate to suggest that, to avoid chaotic conditions at year's end, it might be prudent for all parties to join in an urgent request to Congress to extend the statute of limitations for a reasonable period beyond the date of ultimate decision in this litigation. If the federal defendants prevail, no prejudice will result to them; if plaintiffs prevail the federal defendants will have ample time to formulate reasonable, workable proposals, keyed to due process, for the consideration of Congress.