**SHOSHONE–BANNOCK TRIBES, Appellants,**

v.

**Janet RENO, Attorney General of the United States, Appellee.**

No. 94–5073.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 27, 1995.

Decided June 20, 1995.

As Amended June 28, 1995.

Jeanette Wolfley, Boulder, CO, argued the cause, for appellants. With her on the briefs was Reid P. Chambers.

Jacques B. Gelin, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause, for appellee. With him on the brief were Lois J. Schiffer, Asst. Atty. Gen., Edward J. Shawaker and Edward J. Passarelli, Attys., U.S. Dept. of Justice. Albert M. Ferlo, Jr. entered an appearance.

Before: WALD, RANDOLPH, and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

Concurring opinion filed by Circuit Judge ROGERS, in which Circuit Judge WALD joins.

RANDOLPH, Circuit Judge:

The district court dismissed an action brought by the Shoshone–Bannock Tribes of the Fort Hall Indian Reservation for lack of jurisdiction. The Tribes sought to compel the Attorney General to file claims on their behalf in the Snake River basin water rights

adjudication in Idaho state court. We conclude that the Attorney General's refusal to represent the Tribes in the Idaho proceeding is committed to her discretion. Judicial review of the Tribes' claim is consequently unavailable.

## I

On November 19, 1987, an Idaho state court sitting in Twin Falls, Idaho, issued an order commencing a general stream adjudication of water rights for the Snake River basin. The United States was joined pursuant to the McCarran Amendment, 43 U.S.C. § 666, which waives sovereign immunity in state or federal actions for "the adjudication of rights to the use of water of a river system," including water rights held by the United States on behalf of Indian tribes. *See Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 810–13, 96 S.Ct. 1236, 1242–44, 47 L.Ed.2d 483 (1976). In 1990, the Shoshone–Bannock Tribes of the Fort Hall Indian Reservation, the United States, the State of Idaho, and other Idaho water users executed the Fort Hall Indian Water Rights Agreement, quantifying the claimed federal "reserved water rights" (of which more hereafter) not only within the boundaries of the Fort Hall Reservation, but also appurtenant to certain reserved lands outside the Reservation, held in trust for or owned by the Tribes and its members.[1] The Tribes took the lead in negotiating this agreement, although the federal government funded the studies connected with establishing these reserved water rights. Congress ratified the agreement in the Fort Hall Indian Water Rights Act of 1990, Pub.L. No. 101–602, 104 Stat. 3059. Currently, the United States is defending the claims embodied in the agreement against third-party objections and is seeking their approval in the Idaho state court.

The Fort Hall Indian Water Rights Agreement did not settle the Tribes' claim, central to the case before us, to other water rights in the Snake River basin beyond the Fort Hall Reservation's boundaries. The claim stems, according to the Tribes, from the Treaty of Fort Bridger of July 3, 1868, 15 Stat. 673, 674–75. Article IV of the Treaty gave the Tribes the right, outside the Reservation, "to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts." In 1988, without taking a position on the merits of the Tribes' claim, the Bureau of Indian Affairs hired experts to conduct instream flow studies in the lower Snake, the Salmon, and the Clearwater River basins. The studies began in 1989, with the goal of quantifying the instream flows necessary to preserve fish and other natural resources potentially protected by treaties with various Idaho Indian tribes, including the Shoshone–Bannock Tribes. Quarterly meetings to review progress on the studies were held. Participants included a technical advisory committee comprising Bureau staff and members of the Shoshone–Bannock Tribes, the Nez Perce Tribe, and the Northwestern Band of the Shoshoni Nation; the experts hired by the Bureau of Indian Affairs; and legal representatives of the Department of the Interior, the Department of Justice and each of the Indian tribes.

In early 1992, the Interior Department asked the Shoshone–Bannock Tribes to submit legal arguments, with relevant documentation, to support their claims to off-reservation water rights in the Snake River basin. The Tribes supplied information showing that Idaho courts had interpreted the Tribes' treaty-granted hunting rights to include fishing rights. They also offered to arrange a meeting with their anthropologist, an offer the Department of the Interior declined. On May 19, 1992, the Idaho district court ordered that all remaining federal claims, including claims made by or on behalf of Indians, be filed by March 25, 1993. Prompted by the order, the Interior Department intensified its efforts to assess the merits of the

1. Three other tribes potentially possess water rights in the Snake River basin—the Nez Perce Tribe, the Northwestern Band of the Shoshoni Nation, and the Shoshone–Paiute Tribes of the Duck Valley Indian Reservation. The United States has filed federal reserved rights claims in the Snake River basin proceeding on behalf of the Nez Perce Tribe. The Nez Perce Tribe and the Northwestern Band of the Shoshoni Nation have also filed their own claims.

Tribes' claims to off-reservation water rights in the Snake River basin.

On November 16, 1992, the Interior Department's Regional Solicitor and other representatives of the United States met with the Fort Hall Business Council, the Tribes' governing body. The Regional Solicitor told the tribal council and its attorneys that, based on a preliminary analysis, he would recommend against the Justice Department's filing a claim for off-reservation instream flows on behalf of the Tribes. Nevertheless, he again invited the Tribes to support their claims with historical information and legal arguments. The Regional Solicitor also told the Tribes that the United States had hired a historical expert to investigate the basis of the Tribes' claim to water rights in the Snake River basin. Two more meetings and an exchange of information between the United States' and the Tribes' historical experts followed. On March 4, 1993, the Regional Solicitor recommended to the Interior Department's Acting Solicitor that the United States not file instream flow claims on behalf of the Tribes. The Acting Solicitor orally informed the Tribes, on March 22, 1993, that he had recommended against the Department of Justice's filing claims to off-reservation water rights on behalf of the Tribes. The next day he sent a letter to the Chairman of the Tribes' Business Council confirming his decision and explaining the legal rationale underlying it.

The Tribes then brought this suit against the Attorney General, seeking: (1) a declaratory judgment that the United States had violated its responsibility to the Tribes by refusing to file claims to off-reservation water rights in the Snake River basin proceeding; (2) an order compelling the Attorney General to file the claims on the Tribes' behalf; (3) an order directing the government to release all technical data in its possession relating to the Tribes' claims; and (4) an award of damages, costs and attorneys fees. On March 24, 1993, the district court granted a temporary restraining order requiring the United States to file the claims in the Idaho state court, and the United States complied.

The district court later denied the Tribes' motion for a preliminary injunction, finding that the Tribes had not shown they were likely to succeed on the merits of their claim or that they would suffer irreparable harm if the court did not grant their motion. The district court ultimately dismissed the Tribes' suit for lack of subject matter jurisdiction, a judgment from which the Tribes now appeal. The court concluded that the federal government's general trust responsibility toward the Tribes did not require the Attorney General to file suit and that the Tribes had not identified a "specific treaty, statute, or agreement" obligating the Attorney General to bring the water rights claims. Nor had the Tribes established an attorney-client relationship between themselves and the United States that might require the Attorney General to file their claims.

## II

The United States creates reservations by withdrawing land from the public domain and reserving the land for a particular purpose, such as an Indian reservation or a national forest or a national park or monument. With respect to such reservations, courts have long applied the federal-reserved-water-rights doctrine, giving the United States the appurtenant unappropriated waters necessary to accomplish the purposes for which the government created the federal reservation. *Cappaert v. United States,* 426 U.S. 128, 138, 96 S.Ct. 2062, 2069, 48 L.Ed.2d 523 (1976); *Arizona v. California,* 373 U.S. 546, 601, 83 S.Ct. 1468, 1498, 10 L.Ed.2d 542 (1963); *Winters v. United States,* 207 U.S. 564, 575–78, 28 S.Ct. 207, 211–12, 52 L.Ed. 340 (1908). The doctrine rests on the idea that the reservation of public lands for a public purpose implies the reservation of unappropriated, and thus available, water appurtenant to the land to the extent necessary to fulfill that purpose. Because this is a federal right, derived from the federal reservation of the land, it does not depend on state law. With respect to reserved water rights on Indian reservations, these federally-created rights belong to the Indians rather than to the United States, which holds them only as trustee. Nevertheless, the United States may be joined in a

general stream adjudication to file and defend Indian reserved water rights, as it was in the Idaho proceeding. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. at 810–13, 96 S.Ct. at 1242–44.

■ The Tribes' claim to a water right in this case did not pertain to land within its Reservation boundaries nor, so far as we can tell, did the claim derive from the government's withdrawal of land from the public domain and its reservation for a particular purpose. The Tribes' claim dealt instead with "the unoccupied lands of the United States so long as game may be found thereon," and the Tribes' treaty right to "hunt" on those unoccupied lands outside its Reservation. The Department of the Interior and the Department of Justice concluded, for reasons we see no need to explain, that the Tribes' water rights claim was meritless, that the United States would therefore not file and defend it in the state adjudication, and that if the Tribes wished to proceed they would have to do so on their own. The question is whether the federal courts have the authority to force the United States to pursue this claim on the Tribes' behalf.

"Except as otherwise provided by law," the authority to conduct litigation in which the United States is interested is reserved to the Department of Justice, 28 U.S.C. § 516, and the Attorney General shall supervise that litigation, 28 U.S.C. § 519. Because the Tribes seek to compel the Attorney General to take action on their behalf, the district court treated their claim as one sounding in mandamus.[2] A court may properly issue a writ of mandamus only if "the duty to be performed is ministerial and the obligation to act peremptory and clearly defined. The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable."[3] *13th Regional Corp. v. De-*

*partment of Interior,* 654 F.2d 758, 760 (D.C.Cir.1980) (citing *United States ex rel. McLennan v. Wilbur,* 283 U.S. 414, 51 S.Ct. 502, 75 L.Ed. 1148 (1931)).

In both civil and criminal cases, courts have long acknowledged that the Attorney General's authority to control the course of the federal government's litigation is presumptively immune from judicial review. In criminal proceedings, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985) (citing *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978)). Adhering to this principle, this court has declined to review a federal prosecutor's decision regarding a plea agreement, *Newman v. United States,* 382 F.2d 479, 480 (D.C.Cir.1967), and the Attorney General's decision not to prosecute alleged criminal conduct, *Powell v. Katzenbach,* 359 F.2d 234, 235 (D.C.Cir.1965), *cert. denied,* 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 359 (1966); *see also Community for Creative Non–Violence v. Pierce,* 786 F.2d 1199, 1201 (D.C.Cir.1986). Courts have also refused to review the Attorney General's litigation decisions in civil matters. The Attorney General's exercise of discretion under § 5 of the Voting Rights Act is judicially unreviewable, *Morris v. Gressette,* 432 U.S. 491, 500–01, 97 S.Ct. 2411, 2418–19, 53 L.Ed.2d 506 (1977), as is the Attorney General's invocation of the Supreme Court's jurisdiction in a federal-state controversy, *United States v. California,* 332 U.S. 19, 27–29, 67 S.Ct. 1658, 1662–64, 91 L.Ed. 1889 (1947). *See also Swift v. United States,* 276 U.S. 311,

---

**2.** The federal mandamus statute, 28 U.S.C. § 1361, provides:

   The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

**3.** Plaintiffs assert that they also seek a mandatory injunction under 28 U.S.C. § 1331 and the Administrative Procedure Act. Because the Admin-

istrative Procedure Act precludes judicial review of agency action "committed to agency discretion by law," 5 U.S.C. § 701(a), we reach the same result whether we label the relief sought as mandamus or as a mandatory injunction. Under either approach, the question is whether the Attorney General possesses unreviewable authority to reach the decision she did. *See Carpet, Linoleum & Resilient Tile v. Brown,* 656 F.2d 564, 567 (10th Cir.1981).

331, 48 S.Ct. 311, 316, 72 L.Ed. 587 (1928); *FTC v. Claire Furnace Co.*, 274 U.S. 160, 174, 47 S.Ct. 553, 556, 71 L.Ed. 978 (1927).

The Attorney General's power to supervise litigation in which the United States is interested or is a party has its limits. A federal attorney may not deliberately base a decision to prosecute on race, religion or the exercise of protected statutory or constitutional rights. *Wayte*, 470 U.S. at 608, 105 S.Ct. at 1531. And statutes may limit the Attorney General's discretion. *See, e.g., United States v. California*, 332 U.S. at 19, 67 S.Ct. at 1658; *Swift*, 276 U.S. at 331, 48 S.Ct. at 316. We have held that the Attorney General's exclusive authority to represent an agency in federal court was restricted by a legislative grant of independent litigating authority to the agency. *Mail Order Ass'n v. United States Postal Serv.*, 986 F.2d 509, 527 (D.C.Cir.1993). Similarly, civil laws governing agency conduct may limit the Attorney General in conducting litigation on an agency's behalf. *See Executive Business Media v. Department of Defense*, 3 F.3d 759, 761 (4th Cir.1993).

As to the Attorney General's refusal to assert the Tribes' claims in the Idaho water rights adjudication, that decision was presumptively within her discretion. The circumstances resemble, in many respects, those of *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), in which an agency refused to enforce its regulations. For reasons that fully apply to this case, the Supreme Court held that "agency refusals to institute investigative or enforcement proceedings" are presumed immune from judicial review under 5 U.S.C. § 701(a)(2).[4] *Chaney*, 470 U.S. at 832, 105 S.Ct. at 1656. Courts are ill-equipped to evaluate the factors that go into a decision not to bring suit or to enforce regulations. *Id.* "[T]he agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall

policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.; cf. Wayte*, 470 U.S. at 607, 105 S.Ct. at 1530. In addition, the government's refusal to institute legal proceedings—as compared to an affirmative exercise of power—is less likely to encroach upon protected liberty or property interests. *Chaney*, 470 U.S. at 832, 105 S.Ct. at 1656. Judicial monitoring of a refusal to act is correspondingly less necessary. *Id.*

To be sure, *Chaney* held only that an agency's decision not to enforce its regulations is presumptively unreviewable. Judicial review may be had if Congress has "indicated an intent to circumscribe agency enforcement discretion, and ... provided meaningful standards for defining the limits of that discretion." *Id.* at 834, 105 S.Ct. at 1657. With respect to this case, is there a "meaningful standard" for assessing whether and how the Attorney General should exercise her discretion in deciding to assert claims on the Tribes' behalf in the Snake River basin water rights adjudication?

■ The Tribes identify no statute or other restriction so limiting the Attorney General's discretion here. The provision conferring authority on the Attorney General to represent tribal interests contains no "meaningful standard" limiting her prosecutorial discretion. That provision, 25 U.S.C. § 175, states: "In all States and Territories where there are reservations or allotted Indians the United States attorney shall represent them in all suits at law and in equity." This court has already recognized that the statute "impose[s] only a discretionary duty of representation." *Pyramid Lake Paiute Tribe of Indians v. Morton*, 499 F.2d 1095, 1097 (D.C.Cir.1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). *Pyramid Lake* rejected a tribe's claim for reimbursement of its legal expenses incurred in its successful challenge to a regulation promulgated by the Secretary of the Interior. We held that § 175 did not provide the "direct statutory authority" necessary to sustain an award of attorneys' fees against the United

---

**4.** Under the Administrative Procedure Act, all final agency actions—including an agency's failure to act—are subject to judicial review unless

"(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).

States. 499 F.2d at 1096–97; *see also Rincon Band of Mission Indians v. Escondido Mutual Water Co.,* 459 F.2d 1082, 1084 (9th Cir.1972). Even without this precedent, however, we would conclude that § 175 is one of those statutes "drawn in such broad terms that in a given case there is no law to apply." *Chaney,* 470 U.S. at 830, 105 S.Ct. at 1655 (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971)). The provision does not withdraw discretion from the Attorney General, and it offers no standards for judicial evaluation of the Attorney General's litigating decisions to pursue or not to pursue particular claims.

The Tribes have not alleged and the record does not show that the Attorney General acted in bad faith in rejecting the Tribes' request. There is surely nothing in § 175, or any other federal statute, obligating government attorneys to file what they believe are meritless claims. Professional ethics are not suspended whenever an Indian tribe seeks to have the government represent it. Idaho has its own Rule 11, comparable to Rule 11 of the Federal Rules of Civil Procedure, requiring attorneys who sign and file pleadings and other papers to have a reasonable belief that the pleading or paper is well grounded in fact and is warranted by existing law or a good faith argument for the extension of existing law. IDAHO R.CIV.P. 11(a)(1).

■ While it is true that the United States acts in a fiduciary capacity in its dealings with Indian tribal property, *United States v. Cherokee Nation of Oklahoma,* 480 U.S. 700, 707, 107 S.Ct. 1487, 1491, 94 L.Ed.2d 704 (1987), it is also true that the government's fiduciary responsibilities necessarily depend on the substantive laws creating those obligations. *United States v. Mitchell,* 463 U.S. 206, 224–25, 103 S.Ct. 2961, 2971–72, 77 L.Ed.2d 580 (1983) (*Mitchell II*); *United States v. Mitchell,* 445 U.S. 535, 542, 100 S.Ct. 1349, 1353, 63 L.Ed.2d 607 (1980) (*Mitchell I*). We agree with the district court that an Indian tribe cannot force the government to take a specific action unless a treaty, statute or agreement imposes, expressly or by implication, that duty. "Without an unambiguous provision by Congress that clearly outlines a federal trust responsibility, courts must appreciate that whatever fiduciary obligation otherwise exists, it is a limited one only." *National Wildlife Fed'n v. Andrus,* 642 F.2d 589, 612 (D.C.Cir.1980).

■ The Treaty of Fort Bridger, giving the Tribes their right to hunt on "the unoccupied lands of the United States so long as game may be found thereon," does not require the United States to litigate the claim the Tribes desire to pursue in Idaho. There is nothing to the Tribes' contention that the "mere existence" of the Treaty requires the federal government to protect whatever claims to off-reservation water rights the Tribes may wish to advance. *Mitchell I,* 445 U.S. at 542, 100 S.Ct. at 1353, and *Mitchell II,* 463 U.S. at 224, 103 S.Ct. at 2971, establish that the scope of the United States' duty to an Indian tribe depends on the underlying substantive law giving rise to that obligation. The Treaty creates a doubly contingent tribal hunting right: the federal lands outside the Reservation must remain unoccupied, and game must continue to be found on those federal lands. The Treaty does not suggest in the slightest that upon the Tribes' request, the United States is bound to file and defend meritless claims to water rights allegedly derived from this provision. The Tribes have a conditional hunting right as against the United States, not a right to demand that the Department of Justice act as its attorney for any and all claims the Tribes consider worth filing in state court. To the extent the government had some duty to evaluate the Tribes' position before rejecting it, it fulfilled that obligation. The government undertook instream flow studies; discussed with the Tribes their claim to off-reservation water rights; retained a historian to determine if the Treaty might be read as the Tribes apparently viewed it; and actively sought the assistance of the Tribes and their experts.

The Tribes point us to three cases supporting, they say, their contention that the government's role as trustee requires the Attorney General to file claims on their behalf in the Idaho proceeding. In the first, *Fort Mojave Indian Tribe v. United States,* 23 Cl.Ct. 417, 419–20 (1991), Indian tribes sued

the federal government for damages, alleging deficiencies in the government's representation of the tribes in the *Arizona v. California* proceeding that quantified the tribes' federal reserved water rights. That the tribes had such reserved rights all agreed. *Id.* at 425. The only issue was how the rights should be measured. The Claims Court held that the United States was not immune from the suit and that the federal government had a duty to protect the tribes' property—the reserved water right, which the government held in trust. *Id.* at 426–27. On the question before us, *Fort Mojave* has nothing to say. The United States does not hold any recognized off-reservation water right in trust for the Tribes—it denies that one exists. Whether the United States is correct may ultimately be determined by the Idaho court if the Tribes pursue their claim on their own behalf, as they have every right to do. In the meantime, the United States has no duty, or at least no legal duty a federal court may impose on it, to assent to the Tribe's litigation demand. The Tribes' other two cases— *Covelo Indian Community v. Watt,* 551 F.Supp. 366 (D.D.C.1982), *vacated as moot,* No. 83–2377 (D.C.Cir. Feb. 1, 1983), and *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370 (1st Cir. 1975)—are also wide of the mark. In *Covelo,* the district court found that a statute specifically directing the proposal of legislative solutions for unlitigated Indian claims imposed a mandatory duty on the Secretary of the Interior. *Covelo,* 551 F.Supp. at 382–83. Even if *Covelo* had any precedential value,[5] no such congressional directive exists here. And in *Passamaquoddy Tribe,* the First Circuit merely held that the Indian Nonintercourse Act, 25 U.S.C. § 177, imposed fiduciary obligations on the United States. There is no need to say whether this holding survives *Mitchell I* and *Mitchell II.* The Indian Nonintercourse Act expressly prohibits the conveyance of Indian lands to unauthorized third parties. 25 U.S.C. § 177. Its purpose was to protect Indian lands, leading the court in *Passamaquoddy Tribe* to conclude that such protection would not be meaningful

"without a corresponding federal duty to . . . take such action as may be warranted in the circumstances." *Passamaquoddy Tribe,* 528 F.2d at 379. The contingent treaty provision the Tribes invoke in this case is not comparable. Moreover, even though the *Passamaquoddy Tribe* court held that the Indian Nonintercourse Act imposed fiduciary obligations on the United States, it specifically declined to decide whether this duty required the government to sue on behalf of the plaintiff Indian tribe. *Id.* at 375, 379.

■ The Tribes' remaining contention is that an "attorney-client" relationship between them and the United States somehow limited the Attorney General's authority to refuse to litigate on their behalf. The argument is hard to follow. Attorneys are not bound to file what they consider worthless claims on behalf of their clients. To the contrary, their duty is not to file such claims. If the client is dissatisfied, the client may seek other counsel, as the Tribes may do here. In any event, there was no attorney-client relationship between the United States and the Tribes with respect to the off-reservation water claim. No express agreement created such a relationship. And, as the district court determined, the record does not show that the United States implied, through its conduct, that it would represent the Tribes with respect to this claim. The Tribes make much of an appearance entered by the Department of Justice on behalf of the Tribes in 1987. Yet according to the Tribes' own affidavits, this appearance could not have related to the Tribes' alleged off-reservation water rights. Preparation of that claim did not even begin until 1988. The Tribes also rely on the sworn assertions of their tribal attorneys that "it was clear" the United States was representing the Tribes. These opinions do not establish that the United States had agreed to file any off-reservation water rights claim for the Tribes. The Tribes' lawyers attended the quarterly meetings regarding the instream flow studies, and in December 1992, they met with Interior Department officials, after the De-

---

**5.** *See Natural Resources Defense Council v. Hodel,* 865 F.2d 288, 317 n. 31 (D.C.Cir.1988), refusing to rely on *Covelo* because "it is elementary that a vacated decision is not binding precedent and should not be cited as such."

partment's Regional Solicitor had notified the Tribes that he would recommend against the United States' filing claims on their behalf. If anything, that the Tribes saw fit to retain their own attorneys undermines their contention that the United States had taken on their representation.

We conclude that neither 25 U.S.C. § 175, the Fort Bridger Treaty, nor an attorney-client relationship limited the Attorney General's discretion to refuse to assert the Tribes' claims to off-reservation water rights in the Snake River basin water rights adjudication. Because judicial review of the Attorney General's decision is consequently unavailable, the district court properly dismissed the case.

*Affirmed.*

ROGERS, Circuit Judge, with whom WALD, Circuit Judge, joins, concurring:

I join the court's holding that the Tribes have failed to identify a specific legal obligation constraining the Attorney General's discretion to choose which water rights claims to file in the Idaho State proceeding. I write separately to emphasize two points that are implicit in the court's opinion.

First, as the federal government's trust responsibility toward a particular tribal resource increases in scope, the Attorney General's prosecutorial discretion contracts. Thus, a conclusion that the Attorney General's discretion is unreviewable under *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), is tantamount in the instant case to a decision that the government's trust obligation lacks the specificity required after *United States v. Mitchell,* 463 U.S. 206, 224–25, 103 S.Ct. 2961, 2971–72, 77 L.Ed.2d 580 (1983) (*Mitchell II* ), and *United States v. Mitchell,* 445 U.S. 535, 542, 100 S.Ct. 1349, 1353, 63 L.Ed.2d 607 (1980) (*Mitchell I* ), to impose an affirmative and enforceable duty. Because any fiduciary relationship established by the off-reservation hunting right in the Fort Bridger Treaty does not provide the requisite specificity, the court has no occasion to decide what the scope of the government's duties might be in a more compelling circumstance. *See, e.g., Joint Tribal Council of the Passamaquoddy*

*Tribe v. Morton,* 528 F.2d 370, 379 (1st Cir. 1975); *Fort Mojave Indian Tribe v. United States,* 23 Cl.Ct. 417, 425–26 (1991).

Furthermore, to decide the instant case the court need not appraise the merits of the Tribes' off-reservation water rights claims. Instead, the court has only to evaluate the nature of the government's duty as expressed in the underlying substantive law— namely, the Fort Bridger Treaty. As the court's opinion indicates, the Tribes' contingent hunting right is insufficient to impose a protective trust obligation on the federal government. Opinion at 1482–1483. Having identified no other viable source of the government's duty, the Tribes therefore have no claim to the Attorney General's assistance in filing their claims.