CHEMEHUEVI INDIAN TRIBE, Coyote Valley Bank of Pomo Indians, Elk Valley Rancheria, Hoopa Valley Indian Tribe, the Hopland Band of Pomo Indians, Redding Rancheria, Smith River Rancheria, Plaintiffs,

v.

Pete WILSON, in his official capacity as Governor of the State of California; and the State of California, Defendants.

United States of America, real party in interest; United States Department of Justice, real party in interest; Janet Reno, Attorney General, in her official capacity as Attorney General of the United States; Michael Yamaguchi, in his official capacity as United States Attorney, for the Northern District of California, Defendants.

No. C97–01478 BZ.

United States District Court, N.D. California.

Nov. 24, 1997.

Lester J. Marston, David J. Rapport, Scott Johnson, Rapport & Marston, Ukiah, CA, for Plaintiffs.

Patrick R. Bupara, Asst. U.S. Atty., U.S. Attorney's Office, San Francisco, CA, for real party in interest Defendants.

ORDER GRANTING PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT

ZIMMERMAN, United States Magistrate Judge.

This case presents the difficult question of what remedy exists for an Indian tribe confronted with a state that the tribe believes is not honoring the tribe's rights under the Indian Gaming Regulatory Act, now that the Supreme Court has eliminated the remedy Congress provided. For the reasons explained below, I conclude that the remedy sought by the plaintiff Tribes—a judgment that the United States should sue the State of California on their behalf—is available.

In 1987, the United States Supreme Court held that a state was not authorized to impose its civil laws regulating gaming on Indian reservations within that state. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 209, 107 S.Ct. 1083, 1088, 94 L.Ed.2d 244 (1987). In the absence of clear federal regulation, *Cabazon* left Indian gaming largely unregulated.

In response, Congress enacted the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C § 2701 *et seq.*, in part to provide a uniform national standard governing the operation of gaming facilities on Indian lands. 25 U.S.C. § 2702(3). Its purpose in enacting IGRA, Congress found, was to advance "a principal goal of Federal Indian policy" by providing "a statutory basis for the operation of gam-

ing by Indian Tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. §§ 2701(4), 2702(1).

IGRA divides gaming into three categories. At issue here is class III gaming, a catch-all category that includes games such as baccarat, chemin de fer, blackjack, electronic facsimiles of any game of chance, and slot machines. 25 U.S.C. §§ 2703(7)(B)(i-iii), (8). An Indian tribe which complies with certain requirements not at issue here may conduct class III gaming in conformance with a compact it negotiates with the state within which its reservation is located. 25 U.S.C. § 2710(d)(1).

Each of the seven plaintiffs here is an Indian tribe which beneficially owns a reservation in California on which it seeks to conduct class III gaming. Each Tribe has requested California Governor Pete Wilson to enter into negotiations for a class III gaming compact pursuant to IGRA. Governor Wilson has refused to negotiate with any of the Tribes until he concludes negotiations for a compact with the Pala Band of Mission Indians and the plaintiffs cease all class III gaming presently conducted on their lands.

As enacted by Congress, IGRA authorized an Indian tribe to sue a state in federal court if the state refused a tribe's request to negotiate a compact in good faith. 25 U.S.C. § 2710(d)(7)(A)(i). The suit began a legal process that would produce a negotiated compact, a compact selected by a court-appointed mediator, or regulations permitting gaming promulgated by the Secretary of the Interior. 25 U.S.C. § 2710(d)(7)(B)(i-vii).

In 1996, this comprehensive regulatory scheme was fractured when the United States Supreme Court held that the Eleventh Amendment to the Constitution bars suit by an Indian tribe against a state which refuses to negotiate a Tribal–State Compact and does not consent to suit. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). *Seminole Tribe* left any tribe dissatisfied with the progress of compact negotiations with the

state without a clear legal remedy.[1]  *See* Alex Tallchief Skibine, *Gaming on Indian Reservations: Defining the Trustee's Duty in the Wake of Seminole Tribe v. Florida,* 29 Ariz. St. L.J. 121, 122, 149, 161 (1997).

Under these circumstances, plaintiffs concluded that while the Eleventh Amendment bars their federal suit against the State of California, it does not bar a suit brought by the United States against the State on their behalf. *Arizona v. California,* 460 U.S. 605, 614, 103 S.Ct. 1382, 1388, 75 L.Ed.2d 318 (1983); *United States v. Mississippi,* 380 U.S. 128, 140, 85 S.Ct. 808, 814, 13 L.Ed.2d 717 (1965); *United States v. Minnesota,* 270 U.S. 181, 194–95, 46 S.Ct. 298, 300–01, 70 L.Ed. 539 (1926) (United States has the right to sue the State of Minnesota on behalf of the Chippewa Indian Tribe to protect land patents granted to the Tribe by treaty).

Accordingly, the plaintiffs requested both Michael Yamaguchi, the United States Attorney for the Northern District of California, and the Department of Justice, to represent them in a suit to compel the Governor of California to begin good faith negotiations with the Tribes.  Mr. Yamaguchi declined to represent the Tribes; the Department of Justice did not respond.  Plaintiffs then filed this suit for declaratory and injunctive relief against the United States, the Department of Justice, Janet Reno in her official capacity as Attorney General and Mr. Yamaguchi in his official capacity as United States Attorney for the Northern District of California.[2]

Plaintiffs now move this Court for a summary judgment on their declaratory relief claim.  They seek a judgment declaring that the United States has a mandatory duty to represent plaintiffs in their claim against the State.  In opposition, the federal defendants move to dismiss the entire complaint for lack of jurisdiction and for failure to state a claim upon which relief can be granted.  They assert this Court does not have jurisdiction to require the Attorney General or the United States Attorney to exercise their prosecutorial discretion.

Here, both prosecutors have thus far declined to exercise their discretion on plaintiffs' behalf.  "[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).  The exercise of that discretion is judicially reviewable only under limited circumstances. *Senate of California v. Mosbacher,* 968 F.2d 974, 976 (9th Cir.1992); *Railway Labor Executives Ass'n v. Dole,* 760 F.2d 1021, 1025 (9th Cir.1985) (concurring and dissenting opinion); *Shoshone–Bannock Tribes v. Reno,* 56 F.3d 1476, 1480–1482 (D.C.Cir.1995); *Nader v. Saxbe,* 497 F.2d 676, 679 (D.C.Cir. 1974); *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 388 F.Supp. 649, 655–656 (D.Me.), *aff'd,* 528 F.2d 370 (1st Cir. 1975).  Here, plaintiffs seek only declaratory relief, a form of review less coercive than an injunction or mandamus. *Powell v. McCormack,* 395 U.S. 486, 517–518, 89 S.Ct. 1944, 1961–1962, 23 L.Ed.2d 491 (1969).

---

1. In the opinion which the United States Supreme Court affirmed in *Seminole Tribe,* the Eleventh Circuit had read IGRA to permit a tribe faced with failed negotiations and a non-consenting state to file suit in district court 180 days after the tribe first requested negotiations with the state. *Seminole Tribe of Florida v. Florida,* 11 F.3d 1016, 1029 (11th Cir.1994).  If the state asserted an Eleventh Amendment defense, the suit would be dismissed and the tribe could notify the Secretary of the Interior of the failed compact negotiations.  The Secretary could then prescribe regulations governing class III gaming on the tribe's lands. *Id.*

The United States Supreme Court expressly reserved ruling on whether the remedy described by the Eleventh Circuit existed. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 74, n. 18, 116

S.Ct. 1114, 1133, fn. 18, 134 L.Ed.2d 252 (1996).  No party to this action believes that the remedy described by the Eleventh Circuit exists in the statute.  Nor does the Ninth Circuit. *Spokane Tribe of Indians v. Washington,* 28 F.3d 991, 997 (9th Cir.1994).

A suit under IGRA brought by Indian tribes in state court would appear barred by the exclusive jurisdiction of the federal courts. *Montour v. White,* 212 A.D.2d 891, 622 N.Y.S.2d 371, 373 (3rd Dept.1995).

2. Plaintiffs also sued Governor Wilson and the State of California.  The state defendants have not yet been served.  Plaintiffs and the federal defendants agree that if served, the State would move to dismiss under the Eleventh Amendment.

The Tribes seek to avoid the general rule of absolute prosecutorial discretion by asserting a very limited exception. They contend that 25 U.S.C. § 175 and the fiduciary·relationship between the plaintiffs and the United States government impose a duty on the United States to sue a state on plaintiffs' behalf when the Tribes have no other legal remedy by which to obtain valuable benefits Congress intended them to have.

The language of § 175 is broad:

In all States and Territories where there are reservations or allotted Indians the United States attorney shall represent them in all suits at law and in equity.

Invoking two rules of construction, plaintiffs ask the Court to find that the United States has a mandatory duty to represent the Tribes in their suit against the State. First, they ask this Court to interpret the statute in accordance with its "plain wording." *Mallard v. United States District Court*, 490 U.S. 296, 301, 109 S.Ct. 1814, 1818, 104 L.Ed.2d 318 (1989). Second, they cite the rule that a statute governing Indian affairs should be construed liberally in favor of the Indian. tribes to achieve the benefits Congress intended in enacting the legislation. · *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985); *Parravano v. Babbitt*, 70 F.3d 539, 544 (9th Cir.1995) *cert. denied*, — U.S. —, 116 S.Ct. 2546, 135 L.Ed.2d 1066 (1996).

In the over 100 years of its existence, § 175 has been interpreted in only a handful of reported cases. None have found a mandatory duty on behalf of the United States Attorney to represent an Indian tribe. A number of cases which· hold that the United States Attorney cannot be compelled to·represent an Indian tribe in a conflict situation contain *dicta* that the duty is discretionary. *Rincon Band of Mission Indians v. Escondido Mut. Water Co.*, 459 F.2d 1082, 1085 (9th Cir.1972); *United States v. Gila River Pima–Maricopa Indian Community*, 391

F.2d 53, 56 (9th Cir.1968); *Siniscal v. United States*, 208 F.2d 406, 410 (9th Cir.1953); *Pyramid Lake Paiute Tribe v. Morton*, 499 F.2d 1095, 1096 (D.C.Cir.1974); *Salt River Pima–Maricopa Indian Community v. Arizona Sand & Rock Co.*, 353 F.Supp. 1098, 1099–1101 (D.Ariz.1972).

Numerous·cases have recognized the existence of a fiduciary or "general trust relationship between the United States and the Indian people." *United States v. Mitchell*, 463 U.S. 206, 225, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983); *accord, Seminole Nation v. United States*, 316 U.S. 286, 296–297, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942). This relationship is frequently cited to support damage suits against the government, alleging·mishandling of various aspects of Indian affairs. *Moose v. United States*, 674 F.2d 1277, 1281 (9th Cir.1982); *Mason v. United States*, 198 Ct.Cl. 599, 461 F.2d 1364 (1972) *rev'd on other grounds*, 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973). Plaintiffs, however, are not seeking damages here. No· reported case has relied on § 175 to order a United States Attorney to file suit on behalf of an Indian to avoid the government's breaching a fiduciary duty.[3]

The only case which analyzes the circumstances under which the United States Attorney might have a duty to sue on behalf of Indians is *Shoshone–Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C.Cir.1995). In affirming a lower court decision dismissing the Shoshone–Bannock Tribes' complaint, the Court of Appeals held that neither 25 U.S.C. § 175 nor the government's fiduciary relationship with the Tribes limited the Attorney General's discretion to refuse to assert the Tribes' claims to certain water rights. The Shoshone–Bannock Tribes had requested the United States to sue on their· behalf to enforce certain water rights the Tribes claimed under the Treaty of Fort Bridger. After conducting an investigation, the Interior Department concluded that the Tribes' claims

---

3. A possible exception is *Joint Tribal· Council of the Passamaquoddy Tribe v. Morton*, 388 F.Supp. 649, 653–654 (D.Me.1975)· *aff'd*, 528 F.2d 370 · (1st Cir.1975), in which the Attorney General was ordered to file suit on behalf of the Tribe to avoid the expiration of the period of limitations. It does not appear, however, that the order was

based on § 175. The Court ruled that the Indian Nonintercourse Act, 25 U.S.C. § 177, established a trust relationship between the United States and Indian tribes, and that the United States could not decline to sue on behalf of a tribe solely ·on the basis that no trust relationship existed under § 177. 388 F.Supp. at 667.

were not meritorious and recommended that the Justice Department not assert them. The Tribes then sued the Attorney General for declaratory and injunctive relief and for damages. The District Court treated the Indians' claims as sounding in mandamus and ultimately dismissed the suit for lack of jurisdiction because the Tribes had not shown that the Attorney General was obligated to sue on their behalf.

Noting that the Attorney General's power to supervise litigation may be limited by statute, the Court of Appeals concluded that 25 U.S.C. § 175 did not limit the Attorney General's discretion in that case. Troubled by the fact that § 175 lacked standards for evaluating the Attorney General's litigation decisions and terming the Shoshone–Bannock claims meritless, the Court concluded "there is surely nothing in § 175, or any other federal statute, obligating government attorneys to file what they believe are meritless claims." *Shoshone–Bannock*, 56 F.3d at 1482. The Court noted that the Tribes have "every right" to "pursue their claim on their own behalf." *Id.* at 1483.

The Court of Appeals also acknowledged that "the United States acts in a fiduciary capacity in its dealings with Indian tribal property." *Id.* at 1482. However, the Court held that "an Indian Tribe can not force the government to take a specific action unless a treaty, statute or agreement imposes, expressly or by implication, that duty." *Id.*

The Court concluded that the Treaty of Fort Bridger, which addresses the Tribes' hunting rights, does not expressly or by implication impose any obligation on behalf of the federal government to protect the Tribes' water rights. Two judges concurred specially to emphasize they were not considering "what the scope of the government's duties might be in a more compelling circumstance." *Id.* at 1484.

This case presents just such a "more compelling circumstance." The principal concerns which led the Court of Appeals to conclude § 175 did not provide a duty of representation for the Shoshone–Bannock compel the opposite conclusion here. The federal defendants here do not claim that the plaintiffs' claim is meritless. To the contrary, plaintiffs' claim that the State of California has violated IGRA by refusing to negotiate a compact as required by § 2710(d)(3)(A) appears supported by a literal reading of the statute. Far from having "every right" to pursue this claim on their own behalf, plaintiffs have no legal means to do so. A duty on behalf of the United States to sue the State to bring it to the bargaining table can certainly be implied from IGRA, since it appears that that is the only legal remedy available to the plaintiff Tribes to seek the benefits Congress intended them to have and to preserve the balance Congress carefully struck between the interests of the states and the tribes.[4] Such a duty is also supported by the fiduciary relationship the federal defendants

4. See footnote 1, *supra*. Examining the legislative history of IGRA compels the conclusion that a federal remedy is necessary to preserve Congress's balancing of tribal and state interests and to secure the benefits of IGRA to the tribes. Congress recognized that for many tribes, gaming income "often means the difference between an adequate governmental program and a skeletal program that is totally dependent on Federal funding." S.Rep. No. 100–446, at 2–3, *reprinted in* 1988 U.S.C.C.A.N. 3071, 3071–72. Congress carefully balanced Indian interests—including government services, public safety on tribal lands, economic self-sufficiency, self-determination and sovereignty—against state regulatory, safety and economic interests. *Id.* at 13. The Indian Affairs Committee cautioned that

the compact requirement... [should] not be used as a justification by a State for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes.

*Id.*

Congress recognized the potential unfairness in the compacting process to the tribes and the potential for subjecting tribes to unwarranted state control. *Id.* at 14, *see also* 134 Cong. Rec. 24,026–27, 25,376, 25,380–81. Congress concluded that giving a tribe a federal court remedy if a state refused to negotiate in good faith was essential to encouraging the states to deal fairly with the tribes. S.Rep. No. 100–446, at 14. As Senator McCain stated:

As the debate unfolded, it became clear that the interests of the states and of the gaming industry extended far beyond their expressed concern about organized crime. Their true interest was protection of their own games from a new source of economic competition.... [T]he State [sic.] and gaming industry have always come to the table with the position that what is theirs is theirs and what the Tribe [sic.] have is negotiable.

S. Rep. No. 100–446, at 33.

have with the plaintiffs.[5] Whatever the full extent of the fiduciary relationship, it certainly should include a duty to represent the plaintiffs in a situation where, absent representation, the Tribes will have no legal remedy with which to bring the State to the bargaining table and obtain the benefits of IGRA as Congress intended.

In this motion, the plaintiffs are seeking only declaratory relief, not mandamus as in *Shoshone–Bannock.* Declaratory relief is discretionary. 28 U.S.C. § 2201; *A.L. Mechling Barge Lines, Inc. v. United States,* 368 U.S. 324, 331, 82 S.Ct. 337, 341, 7 L.Ed.2d 317 (1961); *United States v. Washington,* 759 F.2d 1353, 1356 (9th Cir.1985). The factors outlined above favor granting the Tribes the declaratory relief they seek. The chief factor weighing against declaratory relief is the possibility that it might place the federal defendants in a conflict. See, e.g., *Rincon Band of Mission Indians v. Escondido Mut. Water Co.,* 459 F.2d 1082, 1085 (9th Cir.1972). Mr. Yamaguchi, presumably with the approval of the Attorney General, has for some time taken the position that the class III gaming presently conducted by plaintiffs is prohibited in the absence of a compact and that he is prepared to take enforcement action against Indian tribes engaged in uncompacted gaming.[6] This would appear to align Mr. Yamaguchi with Governor Wilson, who wants the plaintiffs to cease current class III gaming as a precondition to negotiating a compact, a position the plaintiffs oppose.

This conflict is more apparent than real. The plaintiffs merely desire that the federal defendants sue the State to begin the almost mechanical process that will produce either a negotiated compact, a compact selected by a court-appointed mediator, or regulations permitting gaming promulgated by the Secretary of the Interior. 25 U.S.C. § 2710(d)(7)(B)(i-vii). Nothing in IGRA permits a state to set preconditions to compact negotiations with the Indian tribes. *Mashantucket Pequot Tribe v. Connecticut,* 913 F.2d 1024, 1028 (2d Cir.1990). The federal defendants should not have to take a position on whether the plaintiffs may continue to operate class III gaming in a lawsuit seeking to require the State to negotiate.[7] Conversely, an enforcement action by Mr. Yamaguchi should not conflict with his initiation of the IGRA negotiating process. Indeed, a compact could well moot the enforcement action.

Accordingly, the plaintiffs' motion for summary judgment is GRANTED. The Court declares that the federal defendants have a mandatory duty to prosecute this action against the State of California on plaintiffs' behalf, to enforce plaintiffs' rights under IGRA to negotiate a compact. The defendants' cross-motion is DENIED.

---

Denying the federal remedy Congress provided could produce the "unwarranted state control" Congress feared. It would permit states to exclude tribes, *de facto,* from class III gaming, or to subject the Indians to burdensome delay and economic hardship by controlling the timing and content of compact negotiations while state gaming activities continue.

5. See p. 807, *supra.*

6. Whether an Indian Tribe must cease existing gaming activities until a Tribal–State compact is signed is unclear under IGRA. Compare 25 U.S.C. § 2710(d)(1)(C), which states:

Class III gaming activities shall be lawful on Indian lands only if such activities are...conducted in conformance with a Tribal–State compact, entered into by the Indian Tribe and the State under paragraph (3) that is in effect with 25 U.S.C. § 2710(d)(3)(A), which states:

Any Indian Tribe having jurisdiction over the Indian lands upon which a class III gaming

activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal–State compact governing the conduct of gaming activities.

Plaintiffs argue forcefully that Congress could not have intended that all Indian gaming cease until compacts are negotiated, given the tremendous unemployment and other financial hardships and dislocations that would flow from such a reading of IGRA.

7. Significantly, on October 1, 1997, Mr. Yamaguchi's office announced that it will defer enforcement action pending the completion of the current negotiations between the State and the Pala Band and the establishment of a "framework" for future negotiations between the State and other Indian Tribes, presumably including the plaintiffs.