UNITED STATES of America,
Plaintiff–Appellee,

v.

THE SPOKANE TRIBE OF INDIANS,
Defendant–Appellant.

No. 94–35515.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 7, 1997.

Decided March 27, 1998.

Scott D. Crowell, Crowell Law Offices, Kirkland, WA, for defendant-appellant.

James R. Shively, Assistant United States Attorney, Spokane, WA, for plaintiff-appellee.

Before: D.W. NELSON, WIGGINS and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge.

On application by the United States, the district court enjoined the Spokane Tribe of Indians from conducting lucrative gambling operations on its reservations. The preliminary injunction was issued under the authority of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et seq., which has since been declared partially unconstitutional. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). In this interlocutory appeal we confront the question whether portions of IGRA not struck down by *Seminole Tribe* support the injunction.

**I**

IGRA, as passed by Congress in 1988, sets up a complex procedure for states and Indian tribes to work out their differences concerning gambling on Indian reservations. The first step in that process is for tribes wishing to conduct commercial gaming to negotiate compacts with the states within whose borders their reservations are located. The Spokane Tribe of Indians was operating a bingo hall and some card games at the time IGRA was passed but wanted to expand its operations. So the Tribe began to negotiate a compact with the State of Washington.

Negotiations did not go well and broke down altogether after two years. As IGRA then allowed, the Tribe sued the State for failure to negotiate in good faith. Following the Supreme Court's decision in *Seminole Tribe*, the State invoked its newfound Eleventh Amendment immunity and brought the Tribe's suit to a sudden end.

While its suit against the State was pending, the Tribe had stepped up its casino operations and started offering a wider range of games. Without a compact in place, the gaming operations violated IGRA and the United States brought this action to put a stop to them. The district court granted a preliminary injunction prohibiting the Tribe from operating most types of games and the Tribe appeals.

**II**

The district court issued its injunction when IGRA was still wholly intact. Does the Supreme Court's decision in *Seminole Tribe*, striking down another section of the same statute, affect the district court's authority to enjoin Indian gaming thereunder? To answer this question we must first examine the history and structure of IGRA to determine the extent to which its parts are mutually dependent.

**A**

In 1987 the Supreme Court held that states were not authorized to regulate gambling in Indian country. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). States disliked *Cabazon* and so the following year Congress passed IGRA. The new law gave states considerable say over gambling in Indian country, but the Act was not an unmitigated defeat for tribes. Rather, the law closely balanced the interests of states

and tribes. IGRA divided games into three classes, each regulated differently. Our concern is with class III gaming-the most lucrative kind-covering all but social gambling and games like bingo. *See* 25 U.S.C. § 2703(8). Under IGRA, class III activities must be authorized by a tribal ordinance approved by the National Indian Gaming Commission, permitted by the state for some person or organization,[1] and covered by a tribal-state compact. *See* 25 U.S.C. § 2710(d)(1).

A different section of IGRA makes it a federal crime to violate state gambling law in Indian country unless authorized by a compact. *See* 18 U.S.C. § 1166. Only the federal government, not the state, may enforce this provision. *See id.*

The tribal-state compact is pivotal to the IGRA provisions governing class III gaming. Without a compact in place, a tribe may not engage in class III gaming. To guard against the possibility that states might choose not to negotiate, or to negotiate in bad faith, Congress included a complex set of procedures designed to protect tribes from recalcitrant states.[2]

In 1996 the Supreme Court emasculated these procedures by holding that tribes are constitutionally precluded from bringing suit against recalcitrant states that do not consent to being sued. *See Seminole Tribe,* 517 U.S. at 72, 116 S.Ct. at 1131 ("[T]he Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States."). The Supreme Court did not consider whether the rest of IGRA survives.

**B**

■ IGRA does contain a severability clause. *See* 25 U.S.C. § 2721. This creates a presumption that if one section is found unconstitutional, the rest of the statute remains valid. But that presumption is not conclusive; we must still strike down other portions of the statute if we find strong evidence that Congress did not mean for them to remain in effect without the invalid section. *See Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 686, 107 S.Ct. 1476, 1481, 94 L.Ed.2d 661 (1987). The question we must ask is this: Would Congress have enacted IGRA had it known it could not give tribes the right to sue states that refuse to negotiate? *See id.* at 685, 107 S.Ct. at 1480; *see also Board of Natural Resources of the State of Washington v. Brown,* 992 F.2d 937, 948 (9th Cir.1993). If the answer is yes, then the rest of IGRA remains valid. If the answer is no, things become more complicated, as we must then ask which other provisions of IGRA are called into question, and under what circumstances.

Figuring out why Congress passed a piece of legislation is hard enough. Figuring out whether it would have passed that legislation in the absence of one of its key provisions is even harder. Yet, figure we must.

Under *Cabazon,* the states had little power to regulate gambling on tribal land. IGRA shifted power to the states-a major blow to tribal interests. Under IGRA states could effectively veto any class III gaming on Indian land simply by refusing to negotiate a

---

1. Quite possibly, Washington does not permit some games at all. The legislature has declared that state policy "restrain[s] all persons from seeking profit from professional gambling activities in this state." Wash. Rev.Code § 9.46.010. Moreover, all gambling premises in the state are common nuisances. *See* Wash. Rev.Code § 9.46.250(1). However, the United States has not seriously pursued this argument, and the Tribe claims that various state commissions can in fact authorize games of chance. One district court has suggested that Washington now merely regulates gambling, rather than prohibiting it. *See Spokane Tribe of Indians v. United States,* 782 F.Supp. 520, 522 n. 2 (E.D.Wash.1991).

2. Under IGRA, a tribe may ask the state to negotiate a compact, and upon receiving such a request the state "shall negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A). If the tribe believes that the state is not negotiating in good faith, it may sue the state in district court. *See* 25 U.S.C. § 2710(d)(7)(A)(i). If the court concludes the state is not negotiating in good faith, it shall order the state and tribe to conclude a compact within 60 days. *See* 25 U.S.C. § 2710(d)(7)(B)(iii). If this fails, the tribe and state are to submit their last best offers to a mediator, who is to choose the compact that best fits federal law. *See* 25 U.S.C. § 2710(d)(7)(B)(iv). If the state does not consent to the compact the mediator chooses, the mediator must notify the Secretary of the Interior, who shall proscribe procedures consistent with the compact that the mediator proposed. *See* 25 U.S.C. § 2710(d)(7)(B)(vii).

compact. Section 2710(d)(7) restored some leverage to the tribes by giving them the right to sue recalcitrant states and thereby forcing them to enter into a compact. *See* n.2 *supra.* It is quite clear from the structure of the statute that the tribe's right to sue the state is a key part of a carefully-crafted scheme balancing the interests of the tribes and the states. It therefore seems highly unlikely that Congress would have passed one part without the other, leaving the tribes essentially powerless.

IGRA's legislative history strongly supports this inference.[3] The Senate report on S. 555, which became IGRA, repeatedly emphasizes that the bill balances the interests of tribes and states. *See, e.g.,* S.Rep. No. 100–446, at 1–2 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3071 ("[T]he issue has been how best to preserve the right of tribes to self-government while, at the same time, to protect both the tribes and the gaming public from unscrupulous persons."); *id.* at 5, 1988 U.S.C.C.A.N. at 3075 ("[T]he Committee has attempted to balance the need for sound enforcement of gaming laws and regulations, with the strong Federal interest in preserving the sovereign rights of tribal governments[.]"); *id.* at 6, 1988 U.S.C.C.A.N. at 3076 ("This legislation is intended to provide a means by which tribal and State governments can realize their unique and individual governmental objectives[.]"). In describing the balancing, the report refers specifically to the provision for suing states:

> Section 11(d)(7) grants a tribe the right to sue a State if compact negotiations are not concluded. This section is the result of the Committee balancing the interests and rights of tribes to engage in gaming against the interests of States in regulating such gaming.... [T]he issue before

the Committee was how best to encourage States to deal fairly with tribes as sovereign governments. The Committee elected, as the least offensive option, to grant tribes the right to sue a State if a compact is not negotiated....

*Id.* at 14, 1988 U.S.C.C.A.N. at 3084.

When the Eleventh Amendment became a concern after IGRA became law, Senator Daniel Inouye, chair of the Senate Committee on Indian Affairs and one of S. 555's authors, explicitly answered our question.[4] He explained that Congress would not have passed IGRA in the form it did, had it known that tribes wouldn't be allowed to sue the states:

> Because I believe that if we had known at the time we were considering the bill-if we had known that this proposal of tribal state compacts that came from the States and was strongly supported by the States, would later be rendered virtually meaningless by the action of those states which have sought to avoid entering into compacts by asserting the Tenth and Eleventh Amendments to defeat federal court jurisdiction, we would not have gone down this path.

Implementation of Indian Gaming Regulatory Act: Oversight Hearings Before the House Subcommittee on Native American Affairs of the Committee on Natural Resources, 103rd Cong., 1st Sess., Serial No. 103–17, Part 1, at 63 (April 2, 1993). Elsewhere, he said, "If the courts rule that the Eleventh Amendment would prohibit the tribal governments from suing State officials, then you've got a piece of paper as a law." Implementation of Indian Gaming Regulatory Act: Hearing Before the Senate Select

---

**3.** Estimable jurists have called into question the value of legislative history. *See, e.g., Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149–50, 117 L.Ed.2d 391 (1992) (Thomas, J.); *Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 616–23, 111 S.Ct. 2476, 2487–91, 115 L.Ed.2d 532 (1991) (Scalia, J., concurring); *Wallace v. Christensen,* 802 F.2d 1539, 1559–60 (9th Cir.1986) (en banc) (A. Smithee, J., concurring). We bypass this controversy because we do not use legislative history to interpret IGRA; rather, we are evaluating a counterfactual: What would have happened if Congress had known that the provision for suing states

was invalid? To answer this question we must understand the political process underlying IGRA's passage, and legislative history is a legitimate source of enlightenment on that issue.

**4.** Post-enactment legislative history is even more suspect than history in place at the time of passage. But, once again, we seek to determine not what the statute means but whether it would have passed without the invalid provision. For this purpose, it's highly instructive to see how one of the key players in the enactment process views the matter.

Committee on Indian Affairs, 102nd Cong., 2d Sess., S. Hrg. 102–660, Part 2, at 58 (March 18, 1992).

IGRA as passed thus struck a finely-tuned balance between the interests of the states and the tribes. Most likely it would not have been enacted if that balance had tipped conclusively in favor of the states, and without IGRA the states would have no say whatever over Indian gaming. In our case, the Tribe claims it attempted to negotiate in good faith, but that attempt failed because of bad faith on the part of the State. The Tribe thus fulfilled its obligation under IGRA. The Tribe then sued the State, as it was entitled to under the statute, but found it could not continue that suit after *Seminole Tribe.* As far as we can tell on the record before us, nothing now protects the Tribe if the State refuses to bargain in good faith or at all; the State holds all the cards (so to speak). Congress meant to guard against this very situation when it created IGRA's interlocking checks and balances.

■ Does this mean that the surviving portion of IGRA is invalid? Not quite. We deal here only with the narrow question presented by this interlocutory appeal: Is a preliminary injunction authorized in these circumstances? The district court granted the injunction back in 1994, long before *Seminole Tribe* transformed the legal landscape. We hold merely that the class III gaming provisions can't form the basis for an injunction against the Tribe on the record before us.

IGRA, however, remains valid and, under some circumstances, it may function close enough to what Congress had in mind to be enforceable by way of injunction. Most obviously, a state might waive sovereign immunity and allow a tribe to sue it in district court; IGRA would then function exactly as intended and there would be no reason not to give it full effect. Here, however, Washington invoked its rights under the Eleventh Amendment and caused the Tribe's suit to be dismissed, distorting the IGRA process. Or, the United States might sue on behalf of a tribe and force the state into a compact.[5] If it did so, IGRA could work as intended and any IGRA violation by the tribe could be enjoined.

Other circumstances would present closer cases. Before *Seminole Tribe* reached the Supreme Court, the Eleventh Circuit anticipated the Eleventh Amendment (no relation) problem. Unlike the Supreme Court, the circuit then considered what happens next. It held that if a tribe sues a state and the state pleads the Eleventh, the tribe may then notify the Secretary of the Interior, who may address the problem by regulation. *See Seminole Tribe of Florida v. Florida,* 11 F.3d 1016, 1029 (11th Cir.1994).

The Tribe here has already applied to the Secretary several times asking him to prescribe regulations, so far with no luck. The Department of the Interior has issued an advance notice of proposed rulemaking, suggesting it is busily considering what to do in situations such as these. *See* Request for Comments on Establishing Departmental Procedures to Authorize Class III Gaming on Indian Lands When a State Raises an Eleventh Amendment Defense to Suit Under the Indian Gaming Regulatory Act, 61 Fed.Reg. 21,394 (1996). The notice cites the Eleventh Circuit decision as authority supporting intervention by the Department. It also cites an earlier opinion of ours, *Spokane Tribe of Indians v. Washington,* 28 F.3d 991 (9th Cir.1994), *vacated* 517 U.S. 1129, 116 S.Ct. 1410, 134 L.Ed.2d 537 (1996). There we considered the Eleventh Circuit's suggestion and said that "such a result would pervert the congressional plan," turning the Secretary of the Interior into "a federal czar." *Id.* at 997. However, that was in the context of our (incorrect) assumption that tribes could sue states. We were pointing out that the

---

**5.** One court has suggested that tribes may sue the United States to force it to sue a state on their behalf. *See Chemehuevi Indian Tribe v. Wilson,* 987 F.Supp. 804, 1997 WL 769275 (N.D.Cal. Nov.24, 1997). The *Chemehuevi* court noted that sovereign immunity does not prevent the United States from suing states, citing *Arizona v. California,* 460 U.S. 605, 614, 103 S.Ct. 1382, 1388–89, 75 L.Ed.2d 318 (1983), *United States v. Mississippi,* 380 U.S. 128, 140, 85 S.Ct. 808, 814–15, 13 L.Ed.2d 717 (1965), and *United States v. Minnesota,* 270 U.S. 181, 194–95, 46 S.Ct. 298, 300–01, 70 L.Ed. 539 (1926). *See* 987 F.Supp. 804, 1997 WL 769275, at *2. We obviously need not decide here whether a tribe may sue the United States to compel it to sue a state.

Eleventh Circuit's suggestion would not be as close to Congress's intent as the scheme Congress in fact passed. True. But the Supreme Court has now told us that Congress's scheme is unconstitutional; the Eleventh Circuit's suggestion is a lot closer to Congress's intent than mechanically enforcing IGRA against tribes even when states refuse to negotiate. Whether or not such rulemaking would bring IGRA's . operation close enough to Congress's intent to save the statute depends on the as yet undisclosed details of the proposed regulations.

None of the circumstances that might justify enforcing IGRA according to its terms appears to be present here. We are left, then, with a tribe that believes it has followed IGRA faithfully and has no legal recourse against a state that allegedly hasn't bargained in good faith. Congress did not intentionally create this situation and would not have countenanced it had it known then what we know now. Under the circumstances, IGRA's provisions governing class III gaming may not be enforced against the Tribe. However, because the court and the parties below operated under incorrect legal assumptions (largely because *Seminole Tribe* had not yet been decided), it's possible that there are facts of which we are ignorant. For instance, perhaps the Department of Justice had evidence that it was the Tribe that had failed to bargain in good faith. Or perhaps the Department of the Interior determined that no class III gaming should be allowed on the reservation because state law prohibits all such gambling. *See* n.1 *supra.*[6] Or, there may be new developments since the district court's decision. We cannot say with certainty that IGRA does not support an injunction against the Tribe; it simply

doesn't on this record. If the United States persists in seeking relief, the district court will have to revisit the question and engage in a new factual investigation guided by a correct legal analysis.[7]

## III

We thus return this case to the district court after vacating the preliminary injunction. We note, however, that the courts aren't the only, or even the most appropriate, forum for solving the problems caused by *Seminole Tribe.* Several Executive Branch agencies may be able to patch up the situation. The Department of the Interior, for example, might promulgate regulations that take the place of the compact process. Or, the Department of Justice might resuscitate the statute by prosecuting tribes only when it determines that the state has negotiated in good faith, or by suing states on behalf of the tribes when it determines that the states are refusing to comply with their obligations under IGRA. These alternatives, and others we haven't thought of, might provide avenues for salvaging IGRA. And, of course, Congress could return to the statute and come up with a new scheme that is both equitable and constitutional.

The district court's judgment is **RE-VERSED**, and the preliminary injunction is **VACATED**.

---

**6.** This might explain Interior's failure to issue regulations.

**7.** The United States also charged the Tribe with violating a portion of the Johnson Act, 15 U.S.C. § 1175, making it unlawful to possess or use a gambling device within Indian country. In granting the preliminary injunction the district court relied on IGRA and its incorporation of state law, and hence did not discuss in any detail

whether the Johnson Act on its own supports the injunction. We note, however, that even if the Tribe did violate the Johnson Act, the two sections enforcing its provisions, 15 U.S.C. §§ 1176 and 1177, call for fines, imprisonment and confiscation of gambling devices as remedies. Neither section provides for injunctions. Moreover, the scope of the injunction here is much broader than the Johnson Act violation, which only concerns gambling *devices.*